UNITED STATES of America, Appellee,

v.

Eugene J. IZZI, a/k/a Gino,
Defendant-Appellant.

UNITED STATES of America, Appellee,

v.

Frank SANTOS, a/k/a Frankie Rubiroso,
a/k/a Efrain Santos,
Defendant-Appellant.

UNITED STATES of America, Appellee,

v.

Alberto Cruz FONTANEZ,
Defendant-Appellant.

UNITED STATES of America, Appellee,

v.

Carlos Cuevas MORALES,
Defendant-Appellant.

Nos. 77–1382 to 77–1385.

United States Court of Appeals,
First Circuit.

Argued Oct. 3, 1979.

Decided Feb. 5, 1980.

**1206**

and Carlos Cuevas-Morales (Cuevas),[1] who were convicted by a jury of conspiracy to possess with intent to distribute heroin and to distribute and to aid and abet in distributing heroin "from on or about the first day of April, 1976, and continuously thereafter up to and including the 20th day of December, 1976, in the District of Puerto Rico and elsewhere." Count I of Indictment. Cruz was also convicted of the substantive crime of distributing heroin on May 17, 1976, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Count II of Indictment.[2]

There are three main issues.

1. Was the evidence sufficient to establish a single conspiracy covering the period from April, 1976, through December 20, 1976?

2. Did the district court err in allowing in evidence the statements of coconspirators?

3. Was the government's failure to turn over to defendants at trial certain alleged Jencks Act material reversible error?

I. *The Conspiracy*

■ Our review of the evidence must be made in light most favorable to the government, "together with all legitimate inferences to be drawn therefrom." *United States v. Doran*, 483 F.2d 369, 372 (1st Cir. 1973), *cert. denied*, 416 U.S. 906, 94 S.Ct. 1612, 40 L.Ed.2d 111 (1974), *United States v. Gabriner*, 571 F.2d 48 (1st Cir. 1978).

■ The testimony at the trial chiefly came from Guillermo Rios Sanchez (Rios), an unindicted member of the conspiracy, Louis Somosa, originally part of the conspiracy and then a government informant, Drug Enforcement Agents, and tapes of telephone conversations and recordings of statements made to Somosa who was fitted with a transmitter at various times.

The first step towards the conspiracy took place at the end of April, 1976, when Rios, who was a radio disc jockey, was

Carlos V. Garcia Gutierrez, Santurce, P. R., for defendant-appellant, Eugene J. Izzi.

Julius Lucius Echeles, Chicago, Ill., with whom Michael G. Cheronis, Chicago, Ill., was on brief for defendant-appellant, Frank Santos.

Gerardo Ortiz Del Rivero, San Juan, P. R., for defendant-appellant, Carlos Cuevas-Morales.

William C. Brown, Atty., Dept. of Justice, Washington, D. C., with whom Jose A. Quiles, U. S. Atty., San Juan, P. R., was on brief, for appellee.

Before COFFIN, Chief Judge, ALDRICH and BOWNES, Circuit Judges.

BOWNES, Circuit Judge.

This appeal is brought by Frank Santos, Eugene Izzi, Alberto Cruz-Fontanez (Cruz),

---

1. Six other alleged conspirators were named in the indictment, but not prosecuted with appellants.

2. Jessie de Jesus was also named as an offender in Count II.

approached by Cruz ostensibly concerning the joint promotion of dances in Puerto Rico featuring bands from the United States. Cruz suggested that Rios meet him at the Holiday Inn so he could meet some people who were going to present dances in Puerto Rico. At the Holiday Inn, Rios was introduced to Santos, who told him that he did radio work in Chicago, that he had friends who were interested in having dances promoted, and that he would see to it that Rios did the promoting. Santos subsequently introduced Rios to Cuevas and Jessie de Jesus, one of the indicted conspirators not tried along with appellants. Rios was told that de Jesus was the one in charge of bringing the dances to Puerto Rico.

de Jesus, Cruz, and Santos asked Rios if he knew anyone who worked at the airport with the necessary connections to obtain tickets whenever needed and who could obtain first class reservations. Rios introduced them to a friend of his, Louis Somosa, who worked as senior crew manager for Eastern Airlines. Santos returned to Chicago a few days later.

About the middle of May, de Jesus told Rios to buy twenty-seven airline tickets for musicians to come from New York to San Juan and then to meet him at his apartment. When Rios got to the apartment, de Jesus told him that the tickets would have to be taken to New York and Rios would be paid well for the trip. de Jesus also told Rios that he was going to help with the mortgages on his house.[3] He then told Rios that, after he delivered the tickets to the musicians, he should wait for a day and bring back a package of "perico basura, garbage." It is clear that Rios understood that de Jesus was referring to heroin. Rios told de Jesus that he did not dare do this, but had a friend who would. Rios immediately, and in de Jesus' presence, called Somosa and explained what de Jesus wanted done. Somosa agreed to be the courier. de Jesus told Rios to deliver the package to Cruz after he returned from New York.

Rios and Somosa proceeded to New York where a package of heroin was delivered to Rios at the Harlem Medical Center by one Alice, allegedly the niece of de Jesus. The package consisted of a shopping bag with round black cylinders, each of which contained heroin. The cylinders were made of black masking tape wrapped around tinfoil which held plastic bags of heroin. Rios turned the package over to Somosa who carried it aboard the plane inside a plastic shopping bag. After arriving back in San Juan, Rios called Cruz and told him the package had arrived. Rios then delivered the package to Cruz at Cruz' apartment. Cruz told him that he had done a good job and not to worry, that he was not going to lose his house. Somosa subsequently called Cruz and told him he wanted $9,000 either in cash or "garbage." Rios communicated this to Cruz who gave him a package of heroin which Rios turned over to Somosa.

A short time later, Rios went to de Jesus' apartment. de Jesus told Cuevas, who was there, that Rios was the one who had brought the package down from New York, whereupon Cuevas patted him and said "good work."

During the third week of May, de Jesus asked Rios to come to his apartment. When he arrived, a Tommy Senteno[4] was there as was de Jesus' wife, Carmen. de Jesus asked Rios to go to Chicago and New York with Somosa and pick up some "garbage." He told Rios to use the word "musicians" as a code for heroin. Rios was also told that Carmen would be in charge of delivering the merchandise in Chicago. de Jesus also told Rios that $9,000 was too high a payment for Somosa. Rios called Somosa at Eastern Airlines, who put a minimum price of $6,000 on his services. de Jesus again promised Rios that he wouldn't have to worry about losing his house and that he would be paid for promoting the dances.

Rios and Somosa flew to Chicago on May 22 where they picked up a suitcase for

---

3. Rios had gone through a divorce and incurred debts in order to meet alimony and support payments. This resulted in three mortgages on his home.

4. Senteno was at most of the meetings, but does not figure in the case at all.

delivery to New York and a shopping bag for Puerto Rico. The suitcase and shopping bag contained heroin packaged in about forty black cylinders of the same type that was used to make up the first New York package. Rios and Somosa delivered the suitcase to de Jesus' sister at her apartment in New York. They then flew back to San Juan with the shopping bag. Rios called Cruz on his arrival and was told to keep the package temporarily. After several days, the shopping bag was delivered to Cruz who put it in de Jesus' automobile.

Rios, according to his testimony,[5] had difficulty getting paid and went to Cuevas and complained. Cuevas said he would speak to Cruz and de Jesus. Cuevas subsequently told Rios that they did not want to have anything to do with him. Later, de Jesus told Rios in Cruz' presence that he was sending Cruz to Chicago to collect payments from Santos for some merchandise and Cruz would pay Rios $6,500 on his return. A few days later, Rios met Cruz and Cuevas at a restaurant. They gave him $1,800 and told him that was all he was going to get. There was evidence by way of telephone records that, before each of the trips by Rios and Somosa, de Jesus had called Santos in Chicago.

On June 15, Somosa met with two DEA agents disguised as hippies at the Holiday Inn in Isla Verde for the purpose of selling the heroin given to him after the first New York trip. The sale was made for $10,000. When Somosa was arrested seven weeks later, he agreed to do undercover work and have his conversations recorded.

Santos returned to Puerto Rico on August 9 and stayed until August 20. Somosa, under surveillance and wearing a recording device, met with Santos at the airport on August 20, the day of his flight back to Chicago. Santos stated that he had straightened out some problems with Cuevas and Cruz and that Cruz had been thrown out of the organization. Santos also told Somosa that he would put him in good standing with de Jesus as a courier

and that if de Jesus was not able to use him, he would connect him with somebody in Chicago so Somosa could buy dope. Somosa called Santos in Chicago the following day from a DEA phone and asked him about de Jesus. Santos told him that he had spoken to de Jesus and put Somosa in good standing.

Somosa went to Chicago in November pursuant to DEA instructions. He called Santos three times on November 8 from the DEA regional office. During these recorded calls, which were introduced in evidence, Somosa told Santos that he was in Chicago with a man who had $100,000 to invest. Arrangements were made to meet with Santos at "Frank and Pat's Lounge," located in East Chicago, Indiana. A transmitter was installed on Somosa and he proceeded to the meeting place under surveillance. At the lounge, Somosa met Santos and Izzi and was informed that Izzi had some cocaine and "three-quarters of a kilo of heroin" that was for sale for $19,000. Samples of both drugs were shown to Somosa. The heroin was packaged in plastic bags wrapped in black cylinders made of black masking tape and tinfoil similar to the cylinders Somosa had picked up in New York and Chicago in May. Somosa kept a small sample of the cocaine and heroin which was turned over to the DEA agents. A field test showed the samples to be as represented. Somosa called Santos several times that day from the DEA phone to finalize the transaction. He was told that the cocaine had been sold, but the heroin could be delivered the next day for $19,000.

The next morning, after another recorded phone call, Somosa and DEA Agent Jimenez went to Frank and Pat's Lounge. Somosa went in and called Santos. Izzi arrived in about fifteen minutes and asked Somosa to take a ride with him in his Cadillac. They drove around the corner and Izzi parked and gave Somosa a paper bag containing three cylinders of heroin. Somosa took the heroin to Jimenez who gave him $19,000 which Somosa turned over

---

5. Somosa testified on cross-examination that he sold the heroin given to him in payment for the first trip for $10,000, out of which he kept $300 and gave the balance of $9,700 to Rios.

to Izzi. After the transaction was completed, Izzi said that more sales could be made and all that Somosa had to do was contact Santos and tell him the quantity needed and when Somosa would be in town.

Somosa subsequently returned to Puerto Rico. On November 30, he called Santos in an ostensible attempt to buy five kilos of heroin. The call was made on a DEA phone. Santos told him to get in touch with the "man," meaning de Jesus, at the Club in Puerto Rico, but not to talk to anyone else. In subsequent recorded conversations, Somosa and Santos talked about their inability to speak to de Jesus about the deal. The last recorded telephone conversation between Somosa and Santos was on December 13, 1976. Santos told Somosa that Izzi had contacted de Jesus and was planning to pick him up at the Chicago airport.

Based on the foregoing facts, it is abundantly clear that Rios, Somosa, Cruz, and de Jesus were part of a conspiracy, formed at the end of April, to import heroin into Puerto Rico for distribution. The evidence as to Santos not only puts him well within the periphery of the scheme to use Rios and Somosa as dope runners for de Jesus, but is a solid basis for an inference that he was, at least, one of the suppliers. Cruz introduced Rios to Santos early on, and Santos in turn introduced Rios to de Jesus, the key man in the conspiracy. de Jesus told Rios that he was sending Cruz to Chicago to collect payments due from Santos out of which Cruz would be paid. There was evidence that phone calls were made by de Jesus to Santos just prior to the New York and Chicago-New York trips. The recorded conversation at the airport on August 20 established that Santos had played an important role in straightening out some difficulties with Cuevas and throwing Cruz out of the organization.

While the evidence as to Cuevas does not implicate him as deeply as the others, it establishes conclusively that he was a knowing participant. He and de Jesus were introduced to Rios by Santos at the Holiday Inn later in April. He complimented Rios for his "good work" in bringing the first package of heroin back from New York. It was Cuevas to whom Rios complained about not being paid and, most significantly, Cuevas, along with Cruz, paid Rios $1,800 for his work as heroin courier.

The necessary components of conspiracy to possess and distribute heroin in Puerto Rico starting at the end of April was established as to Cruz, Santos, and Cuevas. There was a common plan and purpose of which all three had knowledge and each of them participated in the conspiracy to some extent.

The question is when the conspiracy terminated. Or to put it another way, did it continue into November and December as the indictment charges and the government urges? After August 20, there was a hiatus of activity by de Jesus and members of his organization, at least as far as the evidence shows. In early November, Somosa went to Chicago to contact Santos. This was done, not at the request of de Jesus or any member of the organization, but at the instigation of the government. When Somosa called Santos in Chicago, he told him that he had a man with $100,000 to invest. This obviously was not a continuance of the May conspiracy which had been orchestrated by de Jesus. It was not part of any plan by de Jesus, Santos, et al. to bring heroin into Puerto Rico. It was part of a government plan to obtain evidence against Santos and his supplier. The prime mover in this venture was not de Jesus, but the DEA acting through Somosa.

The government argues that evidence of telephone calls made from Puerto Rico by Cuevas on October 4 and 6 to Santos in Chicago and de Jesus in New York indicates a continuing conspiracy. These calls were not tapped and, therefore, their contents are not known. While it may be inferred that the calls concerned drugs, that is as far as any inference can take us. They are not evidence of a link between Santos, de Jesus, and Somosa's November trip to Chicago. Nor does the evidence of the December calls from Somosa to Santos forge a connection between the November purchase from San-

tos and Izzi and the conspiracy that started in late April. All they show is an attempt by Somosa to purchase five kilograms of heroin from either Santos or de Jesus. Based on the evidence, we can only conclude that there was a conspiracy to possess and distribute heroin involving Cruz, Santos, and Cuevas which commenced in late April of 1976 and terminated on August 20.

Indeed, the evidence is slim that there was any kind of a conspiracy in November among Somosa, Izzi, and Santos. A single sale of drugs without more does not establish a conspiracy. *United States v. Mancillas*, 580 F.2d 1301, 1307 (7th Cir.), *cert. denied*, 439 U.S. 958, 99 S.Ct. 361, 58 L.Ed.2d 351 (1978); *United States v. Varelli*, 407 F.2d 735, 748 (7th Cir. 1969), *cert. denied sub nom. Saletko v. United States*, 405 U.S. 1040, 92 S.Ct. 1311, 31 L.Ed.2d 581 (1972). There must be an agreement by the parties, not merely a getting together to consummate the transaction. "It has been long and consistently recognized by the Court that the commission of the substantive offense and a conspiracy to commit it are separate and distinct offenses." *Pinkerton v. United States*, 328 U.S. 640, 643, 66 S.Ct. 1180, 1182, 90 L.Ed. 1489 (1946).

While it might be argued that the calls from Somosa to Santos prior to the actual sale established a conspiracy between them, this clearly does not extend to Izzi. But whether we treat the November sale as a culmination of conspiracy or simply a substantive crime, there is no evidence linking Izzi to the conspiracy that started at the end of April. Izzi's name was not mentioned at all by the other conspirators at any time and he did not enter the picture until the November sale in East Chicago.

We are aware of the rule that "the question of whether the facts indicate one or more distinct conspiracies is normally a matter of fact to be determined by the jury." *United States v. Brown*, 495 F.2d 593, 598 n.5 (1st Cir.), *cert. denied*, 419 U.S.

965, 95 S.Ct. 226, 42 L.Ed.2d 179 (1974). But it is necessary to prove that a defendant was a knowing participant in the conspiracy. *United States v. Brown*, 584 F.2d 252, 262 (8th Cir. 1978), *cert. denied*, 440 U.S. 910, 99 S.Ct. 1220, 59 L.Ed.2d 458 (1979) and cases cited therein. Here, there is no evidence from which the jury could find that Izzi was privy to the activities of the others between the end of April and August 20, much less participated in that scheme.[6] The only explanation for the jury jumping this evidentiary gap was that it transferred the clear guilt of the others to Izzi. Guilt by association is one of the ever present dangers in a conspiracy count that covers an extended period. *See Kotteakos v. United States*, 328 U.S. 750, 774–75, 66 S.Ct. 1239, 1252–53, 90 L.Ed. 1557 (1946); *United States v. Bertolotti*, 529 F.2d 149, 155 (2d Cir. 1975). Recently, in upholding a conviction against the claim that there were two conspiracies and not one as charged, we specifically found that there was no danger of transfer of guilt. *United States v. DiGregorio*, 605 F.2d 1184, 1192 (1st Cir. 1979). Such a finding is not possible here. The conviction as to Izzi must be reversed.

The next question is whether the variance between the length of the conspiracy as alleged in the indictment and the proof of one of a shorter duration requires a reversal for the other defendants. We hold that it does not.

In *Berger v. United States*, 295 U.S. 78, 83, 55 S.Ct. 629, 631, 79 L.Ed. 655 (1935), the Court held that there are three factors to be considered in determining whether the variance is material: whether the allegation and proof substantially correspond; whether the variance could have misled the defendant at trial; and whether the variance is such as to deprive the defendant of his right not to be prosecuted again for the same offense.

Applying these factors to this case, we find no material variance. The evidence as

---

6. We do not think that the use of the same kind of cylinders in November as in May for packaging the heroin supplies the necessary link, as the government urges. Izzi may have been the source for a number of drug pushers, but that does not prove knowing participation in a particular conspiracy.

to the participation of Santos, Cuevas, and Cruz in the conspiracy up to the middle of August was, as we have already indicated, compelling. The defendants cannot claim that they were misled. Seven of the eight overt acts, all of which were proven, were alleged to have occurred in May and June (six in May and one in June). There is no risk here of any of the defendants being prosecuted again for the same offense.

In *United States v. Levine*, 569 F.2d 1175 (1st Cir.), *cert. denied*, 434 U.S. 866, 98 S.Ct. 2824, 56 L.Ed.2d 771 (1977), we pointed out that a variance between the indictment and proof

> only requires reversal if it prejudices the defendant. The source of prejudice in a case such as this is the transference of guilt to an individual defendant involved in one conspiracy from evidence incriminating defendants in a conspiracy in which the particular defendant was not involved.

*Id.* at 1177.

While we have found a transfer of guilt as to Izzi, it does not follow that evidence of the substantive crime of selling heroin in November by Santos and Izzi was improperly allocated to Cruz and Cuevas. Cruz was expelled from the organization in August. The evidence as to Cuevas established him as a henchman of de Jesus, and not involved at all in the November transaction. There were no statements by Santos, Izzi, or Somosa at the time of the November sale of any other evidence implicating Cruz or Cuevas in any way.

The government may have proved too much as far as Santos was concerned, but, unlike Izzi, he was clearly part of the April to August conspiracy. The fact that Santos sold heroin to Somosa in November does not erase the evidence as to his participation in the earlier conspiracy.

We find no prejudice to Santos, Cruz, and Cuevas in the variance between the indictment and proof of duration of the conspiracy.

## II. *The Admission of Statements of Coconspirators*

A review of the record shows that the trial judge did not err in the way he handled the statements of coconspirators. In fact, the judge went further than necessary to insure that the individual defendants would not be prejudiced by coconspirators' statements. Prior to trial, a hearing was held on motions to suppress evidence and, at that time, the district court made searching inquiry as to evidence the government was going to introduce to establish a conspiracy.

Not only did the trial judge inquire as to what evidence the government intended to introduce, he had a DEA agent take the stand and outline the government's evidence on conspiracy and allowed the agent to be cross-examined. Aware of his responsibility under Federal Rule of Evidence 104(a) and *United States v. Petrozziello*, 548 F.2d 20, 23 (1st Cir. 1977), he ruled that the *Petrozziello* standard had been met. The court, however, went further than that. During the trial, it carefully instructed the jury according to the requirements of *United States v. Honneus*, 508 F.2d 566, 569–70 (1st Cir. 1974), *cert. denied*, 421 U.S. 948, 95 S.Ct. 1677, 44 L.Ed.2d 101 (1975). While neither the pretrial determination nor the *Honneus* instructions was necessary, *see United States v. Martorano*, 557 F.2d 1, 11 (1st Cir. 1977), *cert. denied*, 435 U.S. 922, 98 S.Ct. 1484, 55 L.Ed.2d 515 (1978), this procedure did not prejudice the defendants. As we said in *Petrozziello*, "The added layer of fact-finding may not be needed, Weinstein's Evidence ¶ 104[05], but it can seldom prejudice a defendant." *United States v. Petrozziello*, 548 F.2d at 23. Moreover, the court's charge to the jury directed them to view the evidence as to each defendant separately.[7]

We find that the defendants were not prejudiced by the way the district court handled the statements of coconspirators.

---

7. We set out the relevant portion of the district court's charge:

> A separate crime or offense is charged against each one of the defendants in each one

of the indictments. Each offense and the evidence pertaining to it should also be considered separately. The fact that you may find some of the defendants guilty or not guilty on one of the

## III. *The Jencks Act Issue*

 This issue arises through the failure of the government to turn over statements of four government witnesses given to a grand jury in the Northern District of Indiana which subsequently indicted Santos and Izzi for selling heroin. The sale, already detailed, was to Somosa in East Chicago, Indiana, on November 8 and 9, 1976. The four witnesses were Somosa, Rios, and DEA Agents Jorge and Jimenez. The grand jury testimony of the witnesses was given prior to the trial on the conspiracy charge in Puerto Rico. However, when the government, pursuant to the Jencks Act, 18 U.S.C. § 3500, furnished the defendants with a number of statements and reports made by witnesses at the start of the trial in Puerto Rico, the grand jury statements of the four witnesses were not included. This omission came to light after the conspiracy trial had ended when Santos and Izzi were brought to trial in the Northern District of Indiana,[8] and the Jencks Act material furnished them there contained the grand jury testimony. Upon examination, it was found to vary in some degree from the witnesses' courtroom testimony in Puerto Rico.

Although the prosecutor in this case and the case in Northern Indiana was the same person, it seems clear that the failure to disclose was negligent rather than deliberate and the defendants do not seriously contend otherwise.

After a full hearing on defendants' motion for a new trial, the district court ruled that the withheld testimony was not exculpatory and, therefore, production was not mandated under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). It also found that the inconsistencies "would not have made any difference at all in the outcome of this trial."

The withheld testimony and the way it varies from the courtroom testimony is summarized as follows. Agent Jimenez testified before the grand jury that, on November 8, Somosa handed him a pound of heroin and a pound of cocaine. He testified at trial that he had been given two samples, one of cocaine and the other of heroin. Jimenez testified before the grand jury that Cuevas was at "Frankie's Lounge" on November 9. There was no such testimony at the trial. Defendants claim that this could have been used to impeach the credibility of Somosa and Jimenez, both of whom testified as to what happened inside and outside of the lounge on November 8 and 9. At the hearing on the motion for a new trial, the government stated that the grand jury testimony in this respect was a mistake and that, in reality, it was Cuevas' driver, not Cuevas himself, who was in the lounge.

Rios testified before the grand jury that he did not know the last name of Santos, knowing him merely as Frankie. At trial, he testified that he had been introduced to Frankie Santos as Frankie Rubiroso. Rios stated in his grand jury testimony that he did not recall the date on which he flew to New York City in May of 1976. At trial, he testified as to the exact date of the flight. The government pointed out at the post-trial hearing that, prior to testifying at the trial, Rios has been shown the airplane tickets to refresh his memory as to the date. In answer to questions before the grand jury, Rios said that the heroin picked up in New York weighed about seven or eight pounds. On cross-examination during the trial, he gave the weight of the packages as twenty pounds.

It is obvious that the district court was correct in ruling that the grand jury testimony was not exculpatory under the *Brady* rule. What is involved here are minor vari-

---

offenses charged should not control your verdict as to any other offense charged against any of the other defendants. It is your duty to give separate personal consideration to the case of each individual defendant. When you do so, you should analyze the evidence in the case, what it shows with respect to that individual leaving out of consideration entirely any evidence admitted solely against some other

defendant or defendants. Each defendant is entitled to have his case determined from evidence as to his own acts and statements, and conduct and on other evidence in the case which may be applicable to him.

**8.** After trial of one week and some plea bargaining, Santos and Izzi pleaded guilty.

ations between two sets of inculpatory statements. There is nothing in the grand jury testimony that would "tend to exculpate" or "reduce the penalty" as to any of the defendants. *Brady v. Maryland*, 373 U.S. at 88, 83 S.Ct. at 1197.

The variances could, of course, be the basis for an attempt to impeach the witnesses, which is the reason for the Jencks Act. The question, therefore, is whether the negligent failure to turn over this testimony to defense counsel is grounds for a new trial. We have found no case holding that an inadvertent or negligent failure to furnish Jencks Act material is *per se* grounds for a new trial.

The Supreme Court has held that the harmless error doctrine must be strictly applied in Jencks Act cases. *Goldberg v. United States*, 425 U.S. 94, 111 n.21, 96 S.Ct. 1338, 1348 n.21, 47 L.Ed.2d 603 (1976); *Campbell v. United States*, 373 U.S. 487, 497 n.14, 83 S.Ct. 1356, 1362 n.14, 10 L.Ed.2d 501 (1963). Our approach has been to determine whether the defendant has been prejudiced by the government's failure to disclose.

> Principe is wrong, however, insofar as he insists that under 18 U.S.C. § 3500(d) any failure to disclose, no matter how harmless or innocent, requires striking the witness' testimony or a mistrial. . . .
> The district court was entitled to conclude that the government's conduct fell short of being so flagrant as to warrant a mistrial regardless of prejudice, and, further that Principe was not materially prejudiced by the belated disclosure.

*United States v. Principe*, 499 F.2d 1135, 1139 (1st Cir. 1974). *See also United States v. McGovern*, 499 F.2d 1140, 1143 (1st Cir. 1974) (since late delivery of Jencks Act material did not prejudice defense and was not of such magnitude as to suggest bad faith by the government, there was no ground for reversal); *United States v. Sharpe*, 452 F.2d 1117, 1119–20 (1st Cir. 1971) (defendant failed to show prejudice as a result of government's inadvertent failure to turn over two of five pages of Jencks Act material). In a case involving an inadvertent or

negligent failure to turn over tapes, the Second Circuit said, "The question, then, is whether the defense was so greatly prejudiced by the unavailability of the recording at trial as to require the imposition of sanctions against the government." It held that it was not so prejudiced. *United States v. Miranda*, 526 F.2d 1319, 1328–29 (2d Cir. 1975), *cert. denied*, 429 U.S. 821, 97 S.Ct. 69, 50 L.Ed.2d 82 (1976).

Our examination of the trial transcript convinces us that the light caliber of the impeachment ammunition furnished by the grand jury testimony would not have dented the well buttressed evidence of the government. The failure of the government to furnish the grand jury testimony did not result in any prejudice to the defendants.

The conviction as to defendant Izzi is reversed. The convictions of the other defendants are affirmed.