**UNITED STATES, Appellee,**

v.

**Carlos ARBOLEDA,
Defendant, Appellant.**

**UNITED STATES, Appellee,**

v.

**Martin CASTILLO,
Defendant, Appellant.**

**UNITED STATES, Appellee,**

v.

**Jecennia C. ORELLANA,
Defendant, Appellant.**

**Nos. 90–1374, 90–1375 and 90–1524.**

United States Court of Appeals,
First Circuit.

Heard March 4, 1991.

Decided April 8, 1991.

Jeffrey Denner with whom Denner & Associates and Richard Abbott were on brief, for defendant, appellant Arboleda.

Willie J. Davis with whom Davis & Robinson were on brief, for defendant, appellant Castillo.

Andrew P. McEvoy, for defendant, appellant Orellana.

Jean B. Weld, Asst. U.S. Atty., with whom Jeffrey R. Howard, U.S. Atty., and Douglas Cannon, Asst. U.S. Atty., were on brief, for appellee.

Before SELYA, Circuit Judge, ALDRICH and BOWNES, Senior Circuit Judges.

BOWNES, Senior Circuit Judge.

Defendants-appellants Carlos Arboleda, Jecennia Orellana and Martin Castillo appeal their convictions of charges of conspiracy to distribute and to possess with intent to distribute cocaine. They raise a number of issues, some of which are pertinent only to individual defendants and others pertain-

ing to several.[1] All of the issues were briefed either directly or by adoption. We affirm the judgment below in all respects.

## I. THE EVIDENCE

The evidence against the defendants at trial was based primarily on the testimony of convicted drug dealers testifying pursuant to cooperation agreements with the government. Reviewing the evidence, as we must, in the light most favorable to the government, we summarize the facts most pertinent to the issues on appeal.

The defendants were charged with participating in a drug conspiracy[2] during the period between January 1982 and November 1988. Joseph Lodise, originally charged as a conspirator but ultimately pleading guilty, testified that from 1982 to 1987 he had bought cocaine from Arboleda for resale nearly a hundred times. Customarily, he picked up the cocaine at the Raymond, New Hampshire, home of Arboleda and Orellana, who was Arboleda's girlfriend, and at the Plains Community Center, a health club in Lawrence, Massachusetts. On one specific occasion, he telephoned Arboleda's house and arranged a purchase of two ounces of cocaine with Orellana. He picked up the cocaine from her and later paid her for it. As for his dealing with Castillo, Lodise described two occasions on which he accompanied Arboleda to meet with Castillo so that Arboleda could collect payment from Castillo for drugs previously sold to him. He also testified about events surrounding an arrest of himself, Arboleda and Castillo in Lawrence for marijuana possession, which we discuss in Part III.

Peter Mical, another convicted drug dealer cooperating with the government, testified about numerous drug transactions

with and on behalf of Arboleda from 1981 to 1985. In addition to making regular cocaine purchases from Arboleda for resale, Mical also made deliveries of the drug for him. On one occasion, Arboleda had instructed Mical to obtain a kilogram of cocaine from Castillo that Castillo had received from Arboleda. At Arboleda's direction Mical delivered a portion of the kilogram to Lodise. Mical also made five to ten road trips to Homestead, Florida, on Arboleda's behalf to pick up a total of ten to twelve kilograms of cocaine from Arboleda's brother George. The last of these trips took place in September 1985 just prior to Hurricane Gloria.

Another customer of Arboleda's, convicted drug dealer Fred Shaheen, testified that he had been dealing drugs in New Hampshire for several years before meeting Arboleda, whom he approached as a source for cocaine in the spring of 1987. Arboleda agreed to sell him twenty-four ounces of cocaine in exchange for Shaheen's Porsche. On several occasions, Shaheen saw Arboleda deliver kilograms and half kilograms of cocaine.

Brian Riberdy, convicted in Florida of federal drug and weapons offenses, also sold cocaine that he purchased from Arboleda on thirty or forty occasions from 1984 to 1987. He testified that he had also been a customer of Peter Mical's and accompanied Mical on the September 1985 trip to Florida for Arboleda. Riberdy was in partnership with Jean Lemieux of Salem, New Hampshire, and bought cocaine for himself and Lemieux to deal. On one occasion during this period, Riberdy saw fifteen kilograms of cocaine hidden in the woods adjacent to Arboleda's house. In February 1987 Riberdy was arrested in Florida and contacted Arboleda in New Hampshire for

---

1. At various points in their briefs the defendants appear to frame their arguments on grounds that extend well beyond those stated at trial. In this opinion we treat only those arguments fairly presented to the district court (except for one involving a claim of plain error) and consider the remainder not to have been preserved.

2. Carlos Arboleda, George Arboleda, Joseph Lodise, Romer Villalobos, Jecennia Orellana and Martin Castillo were tried on a multi-count in-

dictment handed down in October 1989 that superseded an original multi-count indictment charging twenty-one defendants. Carlos Arboleda, Orellana and Castillo were tried together after Lodise pleaded guilty on the morning of the second day of trial. Because the other counts against defendants were dismissed, the only count submitted to the jury was the conspiracy count.

assistance in raising bail. Although Arboleda said he would "send someone down," ultimately he was no help. When Riberdy later asked Arboleda why he had not sent the money as promised, Arboleda told him that he had been arrested in Lawrence along with Lodise and that the police had confiscated the $17,000 earmarked for Riberdy's bail.

The last drug-dealer witness to testify was Jean Lemieux, a convicted co-conspirator, who had been named in the original indictment. Lemieux testified that Riberdy had introduced him to Arboleda as Riberdy's source. Lemieux bought kilos of cocaine from Arboleda into 1988. On two occasions in 1988 he picked up a kilo of cocaine from Orellana at Arboleda's direction. In September 1988 Lemieux sold the second of these two kilos to Salvatore Ragonese, a former drug partner of Fred Shaheen. Ragonese made this drug purchase as a controlled buy for the DEA. This kilo of cocaine was introduced into evidence at the trial.

Other evidence at trial served mainly to corroborate the testimony of the co-conspirator witnesses. For example, long distance telephone toll records showed calls between Lemieux's home and the Arboleda–Orellana home during August and September 1988, the period of the controlled drug purchase. The Fort Lauderdale Holiday Inn guest registration card of Peter Mical showed him at the hotel from September 22 to September 26, 1985, supporting his testimony about the trip he took for Arboleda at that time.

## II. DELAYED DISCLOSURE OF IMPEACHMENT MATERIAL

The defendants claim that dismissal of their indictments is required because of what they characterize as the government's repeated and pervasive violations of its discovery and Jencks Act obligations. This argument rests generally on the ground that certain rough notes and re-

ports of government interviews with witnesses Shaheen, Riberdy, Mical and Lemieux, and transcripts of Riberdy's testimony in unrelated Florida trials, were not disclosed pretrial pursuant to a discovery order of the court. Instead, this material was turned over to the defense before and during cross-examination of the various witnesses.[3] Although Arboleda and Orellana advert in their briefs to specific information purportedly disclosed untimely by the prosecution, we understand their claim to be one of prosecutorial misconduct through a pattern of continuous discovery violations. We therefore treat the complaint generically, discussing specific allegations where necessary.

The Jencks Act provides:

In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) shall be the subject of subpena [sic], discovery, or inspection until said witness has testified on direct examination in the trial of the case.

18 U.S.C. § 3500(a). As this court has explained: "In order to meet the requirements of the Act, the material must be a written statement signed, adopted or approved by the prosecution witness which relates to the subject matter of the witness's testimony." *United States v. Sorrentino*, 726 F.2d 876, 887 (1st Cir.1984). Because the Jencks Act is designed to provide the defense access to impeachment material, *United States v. Izzi*, 613 F.2d 1205, 1213 (1st Cir.), *cert. denied*, 446 U.S. 940, 100 S.Ct. 2162, 64 L.Ed.2d 793 (1980), critical to our analysis of alleged violations is whether the timing of the disclosures of the material prevented its effective use by the defense. *Id. See United States v. Devin*, 918 F.2d 280, 299 (1st Cir.1990) (impeachment evidence). We begin by sketch-

---

**3.** Reports of interviews with Shaheen by the Boston DEA office, discovered by both the defense and the government during Shaheen's cross-examination, were not delivered to the defense until after cross-examination of Shaheen had ended. The trial court offered the defense the opportunity to recall Shaheen which was declined.

ing the manner in which the putative Jencks material was generally revealed.

During cross-examination of the government witnesses, counsel for Arboleda, lead trial counsel, elicited that the witnesses had been interviewed by various government agents—e.g., DEA, New Hampshire State Police, prosecutors. He claimed that the interviews generated Jencks Act "statements." Pursuant to pretrial agreement between the parties and a discovery order, Jencks material was to have been disclosed one week prior to trial. Although the agreement, discovery order, and the government's open-file policy had given defense counsel pretrial access to voluminous documents, including witness statements, grand jury transcripts, plea agreements and other promises to witnesses, the material revealed on cross-examination had not been produced. By way of explanation to the trial court for the non-production, the government represented that in some instances the prosecution itself had been unaware of the existence of the material[4] and that in others it did not consider the material to be substantially verbatim witness statements within Jencks.[5] As to the latter, the government had provided written notice of its intent to resist production in its response to the defendants' third motion to dismiss, filed months before.[6]

When the issue thus surfaced at trial, the additional material was located and delivered to the trial court for in camera examination. Voir dire was conducted of interviewing agents with respect to their rough notes. The court then ordered the government to turn over to the defense the bulk of the reports, notes and transcripts, withholding only small portions it found nondiscoverable.[7] As new material was disclosed, the court, denying defense motions for mistrial and to strike the witness' testimony, provided the defense an opportunity for a continuance, recess, or to recall the witness for further cross-examination, noting that this was the procedure contemplated by the Jencks Act. See 18 U.S.C. § 3500(c). Defense counsel, reviewing the new information, on each occasion chose to proceed with cross-examining the witness, recalling none for additional cross-examination.

■■■ Assuming, without deciding, that the belatedly disclosed information is properly considered to be within Jencks,[8] we find there was material compliance with the Act. The Jencks Act by its terms limits disclosure of the disputed information until after a witness' direct testimony. 18 U.S.C. § 3500(a). The district court then, "in its discretion, upon application of [the] defendant, may recess proceedings in the trial for such time as it may determine to be reasonably required for the examination of such statement by said defendant and his preparation for its use in the trial." 18 U.S.C. § 3500(c). Defendants made no request for a recess and in fact consistently rejected repeated offers by the court to take whatever time counsel felt was necessary to utilize the new material to full advantage. Moreover, with respect to the agents' rough interview notes the defendants were on notice well in advance of trial that the government intended to resist

---

**4.** E.g., DEA reports of interviews of Shaheen by the Boston DEA office.

**5.** E.g., DEA agents' raw notes of interviews with Mical and Lemieux.

**6.** The defendants have not directed us to, nor have we found in the record, any response by them to the government's position that this information was not discoverable.

**7.** The defendants make no claim here that the withheld material was erroneously denied to them.

**8.** We have reviewed the rough notes and reports prepared of interviews with several government witnesses and we believe that the district court was more than generous in its interpretation of what constituted Jencks material. For instance, DEA Agent Swift compiled raw notes of his interview with Mical, which the court ordered to be produced after hearing voir dire of the agent. But Agent Swift's testimony that while interviewing Mical he would read back to him substantially what he had written to check its accuracy does not compel the conclusion that the notes were a verbatim record of Mical's words within § 3500(e)(2) of the Jencks Act. See United States v. Newton, 891 F.2d 944, 954 (1st Cir.1989) (FBI agent's occasionally asking witness if he had "'gotten it right'" did not mean he was recording the conversation).

production yet nothing in the record shows they challenged this position prior to trial.

◼ The defendants claim that, notwithstanding the narrower post-cross-examination window for discovery provided in the Jencks Act, they are entitled to a remedy because of the violation of a discovery order requiring production of all Jencks material one week prior to trial. We disagree. "The lower court's handling of a matter of non-compliance with discovery orders is within its discretion, and will only be overturned for an abuse of that discretion." *United States v. Samalot Perez,* 767 F.2d 1, 4 (1st Cir.1985) (citing *United States v. Richman,* 600 F.2d 286, 292 (1st Cir.1979); *United States v. Gladney,* 563 F.2d 491 (1st Cir.1977)). No allegations that the government delayed production in bad faith were made by the defendants to the district court. In fact, early on at trial counsel for Arboleda made clear he did not mean to impugn the government's motives, and he expressed no change in this opinion as the trial went on and disclosures increased. The district court was apparently satisfied that there had been substantial compliance with its order. We cannot say this determination was an abuse of discretion or constitutes a ground for dismissal independent of the defendants' claim of Jencks violations.

◼ What ultimately dooms the defendants' argument is their failure to identify any prejudice. Arguing generally on appeal that the cumulative effect of the purported Jencks violations was prejudicial to them, Arboleda and Orellana "allege[ ] no particular detriment suffered as a result of delayed disclosure," *United States v. George,* 752 F.2d 749, 756 (1st Cir.1985), as our cases require.[9] *See id.; United States v. Izzi,* 613 F.2d at 1213; *United States v. McGovern,* 499 F.2d 1140, 1143 (1st Cir. 1974). At trial Arboleda's counsel argued merely that with earlier disclosure his cross-examinations of the various witnesses would have been conducted "different-

ly." This is not enough. Moreover, he persisted in declining the trial court's invitations to recess or recall the witnesses for further questioning. We have in the past treated with skepticism similar claims of prejudice when accompanied by a failure to attempt at trial to mitigate the perceived harm. *See United States v. Ingraldi,* 793 F.2d 408, 413 (1st Cir.1986) (defendant's "failure to move for a continuance when he received the [exculpatory materials] indicates that he was himself satisfied that he had sufficient time to use them to his best advantage."); *United States v. George,* 752 F.2d at 756 (delayed disclosure not prejudicial where no specific allegation of prejudice and defendant "declined the opportunity to recall either witness after production").

◼ Our review of the record convinces us that cross-examination of the witnesses at issue was not hampered. It was thorough, skillful and at times stinging. In addition to all the witnesses' own substantial drug dealing, counsel for Arboleda stressed at length the following impeachment evidence: drug addiction (Shaheen); significant long-term drug use (Riberdy, Mical); a lengthy history of lying and deceit to achieve personal ends (Shaheen, Mical, Lemieux); substantial charge reductions for agreeing to cooperate (Shaheen, Riberdy, Lemieux); and the fact that, as to all of these witnesses, the government's future assistance in attempting to reduce their prison sentences was dependent on whether the government was satisfied with their trial performance. Lemieux in particular was exposed as being completely allied with the government. He admitted that he would not speak with Arboleda's attorney prior to trial because he felt that he should only help the prosecution. It was emphasized that prior to cooperating he had faced a possible term of life in prison as a drug kingpin and that it is likely that he will in fact escape with substantially less than ten

---

**9.** In fact, with respect to one item of information disclosed at trial, counsel for Arboleda at the time expressly stated he had suffered no prejudice, yet the matter is referred to in the defendants' briefs as an example of a discovery violation. It was revealed during cross-examination of Shaheen that the government had taken no position in its response to Shaheen's then-pending motion to reduce his sentence pursuant to Fed.R.Crim.P. 35. With an overnight recess to review the Rule 35 material, counsel stated that there was no prejudice.

years imprisonment for his cooperation.[10] In short, although with pretrial disclosure of the additional material the cross-examinations might have been different, we fail to discern how they might have been better. Accordingly, we find no grounds for reversal in the delayed disclosure.

## III. ADMISSIBILITY OF EVIDENCE OF ARBOLEDA'S AND CASTILLO'S LAWRENCE ARREST

Defendants Arboleda and Castillo challenge the admissibility of testimony by Lawrence, Massachusetts, police officer Alfred Petralia regarding his February 24, 1987, arrest of Arboleda, Castillo and Lodise and the concurrent confiscation of approximately $14,320 from Arboleda's person. Officer Petralia testified that on that evening he and another officer were on duty in Lawrence keeping a house under surveillance for drug activity. At approximately 9:30 he saw the three men drive up and park their car and Lodise enter the house. Lodise came out five minutes later carrying something back to the car. When the officers approached and identified themselves, Lodise appeared to throw something to the driver's side of the car. Arboleda, who had been behind the wheel, and Castillo exited and started down the street. The other officer grabbed Lodise, and after Petralia yelled, "Freeze, police," Arboleda and Castillo returned. A frisk of Arboleda yielded a total of over $14,000 in four separate plastic sandwich bags concealed around his waist. Another bag of money was found underneath the car in the area where Lodise had thrown the object. On the floor of the car behind the driver's seat was a small bag of marijuana. Mari-

juana charges against Arboleda and Castillo were ultimately dismissed, but the money was not returned.[11]

After a voir dire of Officer Petralia and hearing arguments from both sides, the district court ruled that the testimony was relevant to show "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident," and admitted it under Fed.R.Evid. 404(b) [12] with a jury instruction so limiting its use. The defendants had argued that the prejudicial impact of the evidence outweighed its probative value. The government contended that the evidence of the Lawrence arrest, rather than showing extrinsic misconduct of Arboleda and Castillo under Rule 404(b), was directly probative of the conspiracy as it specifically addressed proof of Overt Act 4 in the conspiracy count of the indictment.[13] Because we agree with the government's theory of admissibility, we need not address the trial court's determination that the testimony was admissible under Rule 404(b). *See United States v. Santagata*, 924 F.2d 391, 395 (1st Cir.1991) (court declined to address district court's Rule 404(b) admission of documents otherwise properly admissible as direct evidence of wire fraud scheme).

An overt act in a conspiracy charge functions essentially to show the object of the conspiracy and that the conspiracy " 'is at work.' " *United States v. Medina*, 761 F.2d 12, 15 (1st Cir.1985) (citation omitted). In this case overt act allegations were unnecessary, as the indictment charged a drug conspiracy in violation of 21 U.S.C. § 846. *United States v. Williams*, 809 F.2d 75, 80 (1st Cir.1986),

---

10. The defendants also complain of the government's failure to notify them pretrial that $75,000 seized from Lemieux had been returned to his attorney for payment of attorney's fees. The defense ably cross-examined Lemieux on this substantial benefit to him. We cannot see, and the defendants do not articulate, how the discovery of this information on cross-examination prejudiced them.

11. Although the jury was not so informed, the money was eventually forfeited.

12. Rule 404(b) provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

13. Overt Act 4 charged: "On or about February 24, 1987, JOSEPH LODISE and MARTIN CASTILLO sold and attempted to sell quantities of controlled substances in the area of Lawrence, Massachusetts."

*cert. denied,* 481 U.S. 1030, 107 S.Ct. 1959, 95 L.Ed.2d 531 (1987). Nonetheless, the government having specified overt acts, evidence tending to prove such alleged actions by co-conspirators in furtherance of the conspiracy was relevant. Officer Petralia's testimony of the Lawrence arrest, in combination with and corroborative of the testimony of two other government witnesses, was evidence that three co-conspirators were together on the date specified in the overt act in furtherance of the conspiracy.

Lodise also testified about the Lawrence arrest in connection with other dealings with Arboleda and Castillo. The evidence at issue supported the testimony of Lodise. Earlier that evening he and Arboleda had sold a pound of Arboleda's cocaine to one of Lodise's customers for $14,000. The cash was contained in several plastic sandwich bags, one of which Lodise kept, giving the rest to Arboleda. Arboleda then told Lodise he had to meet with Castillo to collect some money Castillo owed him. When they met Castillo, Lodise saw him give Arboleda a plastic bag containing money. Castillo asked Lodise to get him some marijuana, and the three then drove to the location where they were arrested.

Officer Petralia's testimony also served to corroborate the earlier testimony of Riberdy. Riberdy testified that in February 1987 when he was in a Florida jail, he had contacted Arboleda to help raise money for his release. Although Arboleda promised to do so, no help came. When Riberdy later confronted him, Arboleda told him that he had been collecting the money but had been unable to deliver on the promise because of the seizure from him of approximately $17,000 incident to his arrest in Lawrence with Castillo and Lodise.

We think it plain that the disputed testimony was generally admissible as direct evidence of the conspiracy. Because it tied Arboleda to possession of a large amount of cash in connection with drug sales, it was relevant to the charge, *United States v. Newton,* 891 F.2d 944, 948 (1st Cir.1989). And it corroborated the testimony of accomplices. It was therefore not extrinsic act evidence subject to the Fed.R.Evid. 404(b) standard of admissibility. "Rule 404(b) applies just to evidence of *other* bad acts or crimes—those other than the crime charged. Where evidence of 'bad acts' is direct proof of the crime charged, Rule 404(b) is, of course, inapplicable." *United States v. Tejada,* 886 F.2d 483, 487 (1st Cir.1989) (emphasis original).

■ Although we have concluded that Officer Petralia's testimony was independently admissible, the defendants' claim that it was highly prejudicial requires us to address its admissibility in light of Fed.R. Evid. 403, which provides in pertinent part: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice...." In admitting the evidence under Rule 404(b), the trial court necessarily, albeit *sub silentio,*[14] determined that the probative value outweighed the potential for prejudice, and such determinations are within the sound discretion of the district court, *United States v. Rodriguez–Estrada,* 877 F.2d 153, 155 (1st Cir.1989). "When all is said and done, the district court must be ceded considerable latitude in steadying the balance which Rule 403 demands." *Id.* at 156.

■ Castillo's prejudice complaint centers on what he claims is the unfairness of admitting evidence of another crime—marijuana possession—of which he had already been tried and acquitted. We note that nothing in the record supports his assertion of a trial and acquittal. His cross-examination of Officer Petralia on voir dire elicited

---

**14.** Although the district court did not expressly make " 'findings as to the probative value/prejudicial effect balance,' such findings are not always necessary. *United States v. De La Cruz,* 902 F.2d 121, 123 (1st Cir.1990)." *United States v. Santagata,* 924 F.2d 391, 394 (1st Cir.1991). The court heard extensively from defense counsel on the issue of prejudice and then went on to rule that the evidence was "relevant and admissible, not to prove the character of any of the defendants in order to show action and [sic] conformity therewith," but for the purposes enumerated in Rule 404(b). This can only mean that the court weighed the possible risk of prejudice in deciding to admit the evidence.

that the charge against him in Lawrence had been dismissed, and dismissal is what he argued to the trial court as a basis for excluding the evidence under Rule 404(b). But Rule 404(b) by its own terms is not limited to evidence of offenses resulting in convictions, as it refers to "other crimes, wrongs, or acts." Fed.R.Evid. 404(b). "The fact that charges on a prior crime are dismissed is without independent significance in applying Rule 404(b)." *United States v. Juarez*, 561 F.2d 65, 70 (7th Cir. 1977). Nor do we believe it possesses overwhelming significance in weighing prejudice under Rule 403. The jury was informed that the charges stemming from the Lawrence arrest had been dismissed against Castillo, and the trial court instructed that the evidence was not admitted as proof of the defendants' character or to show action in conformity therewith.

Castillo also complains of the prejudice he suffered by virtue of the fact that Officer Petralia was the first government witness whose testimony placed Castillo in the company of other conspirators. This appears merely to be a complaint that Castillo was prejudiced by the government's efforts to prove its case against him. "The question is one of 'unfair prejudice'—not of prejudice alone." *United States v. Moreno Morales*, 815 F.2d 725, 740 (1st Cir.), cert. denied, 484 U.S. 966, 108 S.Ct. 458, 98 L.Ed.2d 397 (1987).

Arboleda's argument concerning prejudice under Rule 403 is essentially that the evidence invited the bad-character inference prohibited by Rule 404(b) and was so prejudicial relative to its limited relevance that it should have been excluded. In our view, however, as discussed above, the evidence was of more than limited relevance. "When, as in this case, the linked incident occurs close in time, and is highly relevant, to the charged conduct, the argument for admissibility is powerful." *Rodriguez–Estrada*, 877 F.2d at 156 (Rule 404(b)). Moreover, the trial court expressly instructed the jury that the evidence was not to be considered as proof of the defendants'

character. We conclude that the introduction of Officer Petralia's testimony was not an abuse of discretion.

## IV. DEFENSE ACCESS TO GOVERNMENT WITNESS

Arboleda claims that the government denied him pretrial access to one of its witnesses, Jean Lemieux, and thereby violated his sixth amendment right of confrontation. He contends that Lemieux was instructed by DEA Agent Ryan not to speak with Arboleda's attorney. The following pertinent facts were elicited during trial.

On cross-examination Lemieux was asked about an incident, just prior to Arboleda's first scheduled trial,[15] when Arboleda's attorney, Jeffrey Denner, encountered him at the courthouse and asked him if he would speak with him. Lemieux recalled that he had refused to speak to Denner. When asked why, Lemieux testified that his lawyer had advised him not to speak to anyone but agents of the government. He added that, because he was cooperating with the government, he felt he should not help anyone else. He further testified, when asked if anyone from the government had suggested he not speak to Denner, that DEA Agent Ryan told him "that it would be a good idea not to say nothing to nobody." This conversation with Agent Ryan, according to Lemieux, had occurred a week before Denner's attempt to speak with him and after he had been debriefed by the government. On redirect Lemieux testified that the advice from Agent Ryan was given before Lemieux had entered his guilty plea. When Denner tried to speak with him, Lemieux was somewhere in the federal courthouse, accompanied by several New Hampshire State Troopers.

Agent Ryan testified on voir dire that he had advised Lemieux, as part of his debriefing and before his guilty plea, that he should consult his attorney about whom he should talk to and whom he should not. He did not advise Lemieux not to speak to

---

**15.** Arboleda's trial on the original indictment was scheduled for May 1989. He pleaded guilty, withdrew his plea and was tried in December 1989 on a superseding indictment.

defense counsel generally or Denner in particular. Ryan stated that, although Denner had asked him to arrange interviews for him with witnesses Riberdy and Ragonese, he had never asked to set one up with Lemieux. Interviews with Riberdy and Ragonese had been arranged.

Finally, the prosecutor, Assistant United States Attorney (AUSA) Weld, stipulated that Denner had made an effort to talk to Lemieux, although she was not present. AUSA Sharp, who did not prosecute Arboleda's trial, confirmed that Denner had approached her in an effort to interview Lemieux. She stated, "I told him it would be highly unlikely it could be arranged on that particular day." The court then asked, "Did he have any conversations— did you arrange a future date?" Sharp answered, "No."

 "The equal right of the prosecution and the defense in criminal proceedings to interview witnesses before trial is clearly recognized by the courts." *Kines v. Butterworth*, 669 F.2d 6, 9 (1st Cir.1981), *cert. denied*, 456 U.S. 980, 102 S.Ct. 2250, 72 L.Ed.2d 856 (1982). Although unjustifiable government interference with a defendant's right of access to a witness is improper, "[n]o right of a defendant is violated when a potential witness freely chooses not to talk...." *Id.* Unless a witness' refusal to speak to the defense was caused by action on the part of an agent of the prosecution, there is no denial of access by the government. *Cf. United States v. Hoffman*, 832 F.2d 1299, 1303–04 (1st Cir. 1987) (finding of interference with sixth amendment rights requires causal connection between government action and defendant's inability to obtain witness).

Our reading of the record evidence convinces us that Arboleda was not denied pretrial access to Lemieux by the government. Agent Ryan's advice to Lemieux did not target Arboleda's counsel or any other attorney for the defense; he simply told him to consult his own lawyer. Lemieux himself gave several reasons for not speaking to Arboleda's attorney. His lawyer, he said, told him "not to talk to nobody but the government. That was it." Agent Ryan told him only "that it would be a good idea" not to talk to anyone. And he himself felt that he should only help the government, stating, "I can't do two things at the same time." Moreover, there is no evidence that Arboleda's attorney ever attempted formally, either through the prosecutors or the DEA, to arrange a meeting with Lemieux. Arboleda has failed to establish the necessary causal link between the government's conduct and any denial of access to the witness.

In addition, he "does not particularize in what fashion he was prejudiced," which is fatal to his claim. *Salemme v. Ristaino*, 587 F.2d 81, 87 (1st Cir.1978). *See also Kines v. Butterworth*, 669 F.2d 6, 10–11 (1st Cir.1981), *cert. denied*, 456 U.S. 980, 102 S.Ct. 2250, 72 L.Ed.2d 856 (1982).

## V. OTHER ISSUES

1. Defendants challenge the trial court's decision to admit certain documentary evidence without adequate authentication. Thea Stockton, who worked in the accounting department of the Fort Lauderdale, Florida, Holiday Inn, identified the September 1985 hotel registration card of Peter Mical, along with billing sheets for telephone calls charged to his room. Familiar with the manner in which the guest registration cards were produced and maintained in the ordinary course of business, the witness testified that she recognized her boss's initials and the hotel's distinctive rate code on the registration card. According to the card, Mical listed a vehicle on his registration form, which other evidence at trial indicated belonged to Arboleda.

Louise Weeks, a New England Telephone Company employee who maintained telephone company subscriber records issued for billing purposes, identified toll records of Lemieux, Arboleda and Orellana for different time frames during the alleged period of the conspiracy. She recognized the records as ones generated by the phone company in the regular course of its business, created on or about the dates they reflected.

On appeal, Arboleda contends that the evidence was not properly authenticated and was therefore not admissible pursuant to Fed.R.Evid. 803(6).[16] At trial, however, the only objection he made was that the witnesses themselves had not brought the records into court with them. He cites no authority for the proposition that the custodian of the records or other qualified witness must herself have physically carried the documents to court, and we have found none. "A qualified witness is simply one who can explain and be cross-examined concerning the manner in which the records are made and kept." *Wallace Motor Sales v. American Motor Sales Corp.*, 780 F.2d 1049, 1061 (1st Cir.1985). "If there is 'evidence sufficient to support a finding' that the evidence is what the proponent claims it to be, the preliminary threshold of authentication has been satisfied and the jury should then be permitted to consider its weight or credibility." *Kissinger v. Lofgren*, 836 F.2d 678, 683 (1st Cir.1988) (citing 5 J. Weinstein & M. Berger, *Weinstein's Evidence*, ¶ 901(a)( [01] ) at 901–15 to –16 (1983)). In allowing the evidence to be admitted, the trial court did not abuse its considerable discretion in evidentiary matters. *See United States v. Patterson*, 644 F.2d 890, 900–901 (1st Cir. 1981) (determination whether proper foundation laid for introduction of evidence within sound discretion of district court).

2. Defendants Orellana and Castillo appeal the trial court's denial of their motions for bills of particulars. Orellana's motion, however, sought particulars only for the non-conspiracy counts of the indictment against her. Because only the conspiracy count was submitted to the jury and is before us on appeal, Orellana has not preserved this issue for review. In any event, her argument on the merits cannot prevail. She claims she was surprised by evidence at trial but does not specify; she contends she was unable to prepare her defense but does not elaborate.

"The purpose of a bill of particulars is to provide the accused with detail of the charges against him where necessary to prepare his defense, to avoid surprise at trial, and to protect against double jeopardy." *United States v. Paiva*, 892 F.2d 148, 154 (1st Cir.1989). Only if the trial court abused its discretion will its denial of a bill of particulars result in reversal. *Id.* (citing *Wong Tai v. United States*, 273 U.S. 77, 82, 47 S.Ct. 300, 302, 71 L.Ed. 545 (1927)). "It has long been established that actual prejudice to the defendant must be shown to justify reversal." *United States v. Leach*, 427 F.2d 1107, 1110 (1st Cir.), *cert. denied*, 400 U.S. 829, 91 S.Ct. 95, 27 L.Ed.2d 59 (1970), *cited in United States v. Paiva*, 892 F.2d at 154.

Castillo argues that he was surprised at trial by the evidence of his delivery to Mical of the brown bag containing Arboleda's cocaine and that the lack of notice prejudiced his defense. He claims that had he known of this specific allegation he could have investigated to produce other evidence or witnesses to counter Mical's testimony. This does not establish actual prejudice, as he points to no specific evidence or witnesses that the lack of particularization prevented him from obtaining. Castillo's burden to show an abuse of discretion by the district court is a heavy one and is not met by speculation and conjecture.[17]

---

16. Rule 803(6), the business records exception to the hearsay rule, allows into evidence the following:

> A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

17. Castillo's ancillary claim that the "brown bag" evidence could have or should have been alleged as an overt act is also without merit. He was charged "with conspiracy pursuant to 21 U.S.C. § 846. Section 846 does not require the

3. Castillo claims that the evidence was insufficient to support his conviction. When reviewing a sufficiency claim, we consider the evidence "in the light most favorable to the government, drawing all legitimate inferences and resolving all credibility determinations in favor of the verdict." *United States v. Angiulo*, 897 F.2d 1169, 1197 (1st Cir.), *cert. denied*, — U.S. —, 111 S.Ct. 130, 112 L.Ed.2d 98 (1990).

■ To prove its charge against Castillo, the government was required to demonstrate only a tacit understanding between him and the other co-conspirators to possess drugs with the intent to distribute. *United States v. Batista–Polanco*, 927 F.2d 14, 18–19 (1st Cir.1991) (citing *United States v. Pacheco–Ortiz*, 889 F.2d 301, 304 (1st Cir.1989); *United States v. Passos–Paternina*, 918 F.2d 979, 986 (1st Cir.1990)).

■ Castillo does not argue that there was no evidence of a conspiracy, but rather that the evidence failed to connect him to it. We disagree. Mical testified that at Arboleda's direction he went to an apartment in Brookline, Massachusetts, to pick up a kilogram of Arboleda's cocaine from Castillo. Mical was aware that the brown bag given him by Castillo in fact contained cocaine because Mical delivered a portion of it to Lodise later that day. Mical had also been instructed by Arboleda to collect money due from Castillo on a drug debt. Lodise also testified about accompanying Arboleda to meet with Castillo on several occasions for the purpose of Castillo's paying Arboleda for drugs, in addition to his testimony about the events surrounding the February 24, 1987, arrest in Lawrence. On that occasion as well, Arboleda met with ·Castillo in order to collect money owed, and Lodise saw Castillo hand Arboleda a plastic bag containing a substantial amount of money. Lodise also saw Castillo meet Arboleda at City Limits, the night club where Arboleda worked and where, the evidence showed, Arboleda regularly stored large amounts of money from his drug customers.

government to plead or prove any overt act in furtherance of the conspiracy." *United States v. Paiva*, 892 F.2d 148, 155 (1st Cir.1989) (citing

We think the jury was warranted in finding from this evidence more than a mere association between Castillo and the other conspirators. His knowledge of and participation in the conspiracy could rationally be inferred beyond a reasonable doubt.

■ 4. Castillo argues further that he is entitled to a judgment of acquittal because the government's opening statement failed adequately to outline the evidence to be presented against him. In making this claim, he faces three serious obstacles. First, he made no objection to the opening at trial and is thus subject to the plain error standard of review. Fed.R.Crim.P. 52(b) ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.") Second, we have already concluded that the evidence produced at trial was sufficient to support his conviction. "A court would surely not grant an acquittal on the basis of a barren opening statement if the evidence itself proved fertile ground for conviction." *United States v. Ingraldi*, 793 F.2d at 414. Finally, we have held that a district court's denial of a motion for acquittal on the basis of the government's opening statement is not reviewable. *Id.* Castillo did not file such a motion. It would be anomalous to hold that a defendant who affirmatively sought relief at trial is foreclosed from review while one who did not is not. The argument is without merit.

■ 5. Castillo also challenges his sentence pursuant to the sentencing guidelines. Convicted of being part of a conspiracy extending into 1988, he contends that because the government produced no evidence of his involvement in the conspiracy after November 1, 1987, when the guidelines became effective, the district court erred in sentencing him thereunder. His argument rests on the premise that he withdrew from the conspiracy prior to that date, but he has failed to show that he did so.

*United States v. Williams*, 809 F.2d 75, 80 (1st Cir.1986), *cert. denied*, 481 U.S. 1030, 107 S.Ct. 1959, 95 L.Ed.2d 531 (1987)).

"In order to show withdrawal, a conspirator must act affirmatively to either defeat or disavow the purpose of the conspiracy." *United States v. Dunn*, 758 F.2d 30, 38 (1st Cir.1985). " 'Typically, there must be evidence either of a full confession to authorities or a communication by the accused to his co-conspirators that he has abandoned the enterprise and its goals.' " *United States v. Piva*, 870 F.2d 753, 757 (1st Cir.1989) (quoting *United States v. Juodakis*, 834 F.2d 1099, 1102 (1st Cir. 1987) *(per curiam )*).

The district court found that the evidence was insufficient to demonstrate Castillo's active withdrawal from the conspiracy prior to its termination in 1988, and this finding is not clearly erroneous. *See United States v. Wright*, 873 F.2d 437, 444 (1st Cir.1989) (findings of sentencing court not overturned unless clearly erroneous). Nothing in the record indicates any change of heart or abandonment of the cocaine enterprise by Castillo. He was therefore subject to the sentencing guidelines in effect at the time of the completion of the conspiracy. *Cf. United States v. Thomas*, 895 F.2d 51, 57 (1st Cir.1990) (parties agreed guidelines applied "inasmuch as the conspiracy at issue continued past the effective date of the Sentencing Guidelines"). *See also United States v. Williams*, 897 F.2d 1034, 1039–40 (10th Cir.1990) (where no evidence defendant withdrew from conspiracy prior to effective date of guidelines, guidelines sentence proper); *United States v. Rosa*, 891 F.2d 1063, 1069 (3d Cir.1989) (same).

6. Finally, Orellana argues that page one of the judgment order on her conviction is erroneous because it recites her conviction as one of "conspiracy to distribute cocaine and marijuana," whereas the marijuana count had been struck by the court at the close of the government's case. As acknowledged by the government in its brief, this language appears to be a clerical error and should be corrected by the district court pursuant to Rule 36 of the Federal Rules of Criminal Procedure.[18] We remand to the district court for correction of the judgment order, and, if necessary, for resentencing consistent with the corrected order.

*Affirmed.*

---

**18.** Rule 36 provides: "Clerical mistakes in judgments, orders or other parts of the record and errors in the record arising from oversight or omission may be corrected by the court at any time and after such notice, if any, as the court orders."