## GERLING INTERNATIONAL INSURANCE CO., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 26765-83.      Filed May 27, 1992.

*Jules Ritholz* and *Walter P. Stasiuk,* for petitioner.
*Anne Hintermeister* and *Lawrence Hoch,* for respondent.

TANNENWALD, *Judge:* Respondent determined deficiencies in petitioner's Federal income taxes of $885 for the taxable year ending December 31, 1974, $2,043 for the taxable year ending December 31, 1975, $1,439,676 for the taxable year ending December 31, 1976, $1,917,174 for the taxable year ending December 31, 1977, and $2,503,934 for the taxable year ending December 31, 1978. The issues for decision are: (1) Whether petitioner should be required, under section 832,[1] to include in gross income its share of the underwriting income of Universale Reinsurance Co., Ltd., of Zurich, Switzerland (Universale), with whom it had a reinsurance treaty; (2) if this question is answered in the affirmative, whether petitioner has

---

[1] All statutory references are to the Internal Revenue Code in effect for the years in issue, and unless otherwise indicated, all Rule references are to the Tax Court Rules of Practice and Procedure.

substantiated the deduction of its share of the losses and expenses of Universale attributable to that income; and (3) the correct taxable year for the inclusion of such income and the allowance of such deductions.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulations of fact, and the exhibits attached thereto, are incorporated herein by reference. Additional factual background is set forth in two prior opinions of this Court and an opinion of the Court of Appeals for the Third Circuit; it will not be repeated herein except to the extent necessary to an understanding of the issues to be decided. See *Gerling v. Commissioner,* 86 T.C. 468 (1986), supplemented by 87 T.C. 679 (1986), revd. and remanded 839 F.2d 131 (3d Cir. 1988). Additionally, in order to avoid unnecessary repetition, some of the facts underlying our disposition of the issues appear in our opinion herein.

Petitioner is a Delaware corporation with its principal office in Wilmington, Delaware. It filed its Federal income tax returns for the years at issue on an accrual basis with the Internal Revenue Service, Philadelphia, Pennsylvania.

During the years at issue, petitioner was engaged in the business of reinsuring risks under a quota share retrocession treaty (treaty) with Universale, dated December 3, 1957, the pertinent provisions of which are as follows:

*Art. 1.*

Universale undertakes to share with Retrocessionaire [Gerling] the reinsurance business to the extent thereof as hereinafter exactly outlined in the addendum and Retrocessionaire obligates itself to accept such share unquestioningly.

This participation includes any facultative commitments which Universale accepts based on the original treaties retroceded herewith.

*Art. 2.*

This retrocession is done under the conditions as itemized in the addendum. In all other respects the general terms of the original treaties are binding.

*Art. 3.*

The liability of Retrocessionaire starts and terminates simultaneously with the one of Universale; and generally, Retrocessionaire to the extent of

its share assumes in all instances and under all circumstances the fate of Universale emanating from the original treaties. This shall also be the case in the event that a ceding company for whatsoever reasons does not fullfil its commitments to Universale.

The entire business contact with the ceding companies shall be handled exclusively by Universale; Retrocessionaire acknowledges to the extent of its share all payments made by Universale to any ceding company and shares in all results which affect Universale to the extent of its quota.

### Art. 4.

Retrocessionaire shall assume all commitments which will be entered in the future between Universale and the ceding companies with reference to the insurance business which is the subject of this treaty and acknowledges the same as binding within the limits of its quota.

In the event of a change in the share of Universale in the original treaties, it reserves the right likewise to change or extinguish the share of Retrocessionaire after giving notice to that effect.

### Art. 5.

Retrocessionaire waives delivery of a Borderaux. However, it shall receive regularly summarizations of premium, commissions and loss payments for the same period of time for which Universale receives the same or accounts therefore.

### Art. 6.

Premium reserve and other deposits by Retrocessionaire and their interest rate shall be as itemized in the addendum.

### Art. 7.

Universale shall render an account to Retrocessionaire as soon as possible after the receipt of the original current accounts in the same currency and for the same period of time. Within two weeks after the receipt of the accounting, Retrocessionaire shall make objections to Universale, otherwise the account is considered accepted. Balances shall be equalized in the same way as it is done between Universale and its ceding companies if nothing else is agreed upon.

The share of Retrocessionaire in losses payable by Universale shall become due at the same day and shall be put at the disposal of Universale on which Universale itself must make payment.

### Art. 8.

Retrocessionaire shall have the right through an authorized agent to inspect in the office of Universale all the files which affect the risks under this treaty. This right of inspection, however, shall not permit delay in the liquidation of the respective agreed-upon obligations.

An addendum, dated September 12, 1959, set forth the following terms of agreement which were in effect during the years at issue:

1.  Quota share retroceded: 20% of the annual profit and loss accounting relating to casualty insurance of Universale
2.  Overriding commissions in favor of Universale: 1% of ceded premium
3.  Deposits: 100% of technical reserves at the end of the year (premium reserve and loss reserve)
4.  Interest on deposits: 3% p.a.
5.  Account: Annual
6.  Duration of treaty: Indefinite
7.  Termination: 3 months in advance as of the end of each year

Otto Schenker, either an officer or director of Universale, and Armin Bolli, its general manager, negotiated the treaty on behalf of Universale. During and subsequent to the years in issue, Otto Schenker owned 9.22 percent of the stock of petitioner.

Petitioner also derived income from its investments in stocks and bonds.

Under an agreement, dated January 2, 1974, petitioner employed Robert Gerling Co. (RG Inc.) as an "investment adviser and to manage the investment and reinvestment of the assets of GIIC [petitioner] * * * and to administer its [petitioner's] affairs". The agreement further provided that RG Inc. would "furnish office space and clerical and administrative services" for petitioner. The agreement, which was operative during the years at issue, was signed by Gerling on behalf of petitioner and by Horst Kurnik (Kurnik), an attorney, who was a director and vice president of petitioner, on behalf of RG Inc. Kurnik participated in the operations of RG Inc. and petitioner under the agreement and was compensated by RG Inc. for his services to RG Inc. and petitioner. Petitioner paid RG Inc. approximately $50,000 for its services during each of the years at issue.

At all relevant times, petitioner did not have a business office separate from the business office of RG Inc.

At all relevant times, Robert Gerling (Gerling) was the president and director of petitioner and chairman of the board of directors and a shareholder of Universale.

Gerling owned 100 percent of the stock of petitioner until June 1973. He owned 10.82 percent of the stock of petitioner as of January 1, 1976, and 8.82 percent as of January 1, 1977, and all relevant times thereafter. He was an officer of RG Inc., at the time it was formed.

Gerling was a U.S. citizen at all times during and since the years at issue. At the time of trial, he was 76 years old and had not been physically present in the United States in 40 years.

Petitioner submitted an annual report to the Delaware Department of Insurance, in the form of the National Association of Insurance Companies' Annual Statement (NAIC annual statement). Copies of petitioner's NAIC annual statements were incorporated in and attached to petitioner's Federal income tax returns.

After the time that petitioner was required to file such annual statement and after the due date for the filing of its Federal income tax return for the preceding taxable year, petitioner received from Universale an annual summary of premiums, expenses, losses, and other information (technical figures) for such year. For each taxable year at issue, Universale also furnished petitioner with a balance sheet (exercise) and an excerpt therefrom (Handelsamtsblatt), which latter document is published annually in the official Swiss commercial insurance gazette as required by law.

During each of the years in issue, petitioner reported, on its NAIC forms which were incorporated in and attached to its tax returns, as its ceded share of the underwriting premiums, losses, and expenses, the amounts reported to it by Universale for the preceding taxable year. The amounts of underwriting premiums, losses, and expenses reported by petitioner on its NAIC forms for the years in issue were derived from the technical figures, exercises, and Handelsamtsblatt furnished by Universale.

Since the inception of the treaty in 1957, and for the tax years at issue, it was the uniform practice of petitioner to use the amounts contained in the technical figures, exercises, and Handelsamtsblatts to prepare its NAIC forms and determine its

Federal income tax liability for the following year. Petitioner's Federal income tax returns were audited by respondent for 1959 through 1961 but no adjustments were made.

Petitioner ceased its reinsurance activity in 1984 and has conducted no other insurance business since that time.

In her deficiency notice, respondent disallowed all underwriting losses and expenses (as reflected in the following table) incurred by petitioner and/or withheld by Universale on petitioner's behalf:[2]

because it has not been established that they were expended for an ordinary and necessary business purpose or for the purpose designated or that your allocable share of the underwriting losses and expenses was allotted to you and that such underwriting losses and expenses were not the underwriting losses and expenses belonging to Universale * * *:

|  | 1976 | 1977 | 1978 |
|---|---|---|---|
| Losses paid | $1,955,252 | $2,250,633 | $2,620,262 |
| Underwriting expenses | 684,908 | 727,020 | 923,164 |
| Claimed per return | 2,640,160 | 2,977,653 | 3,543,426 |
| Allowed | - - - | - - - | - - - |
| Increase to taxable income | 2,640,160 | 2,977,653 | 3,543,426 |

Accordingly your taxable income is increased in the respective sums of $2,640,160, $2,977,653, and $3,543,426, in 1976, 1977, and 1978.

The deficiency notice also determined that, since petitioner's returns were filed on an accrual basis:

underwriting income, losses and expenses are reportable in the year when all the events have occurred which fix the right to receive such underwriting income or to deduct such underwriting losses and expenses and the amount thereof can be determined with reasonable accuracy. As a result, the underwriting income, losses and expenses reported by you in 1977 and accruable in 1976 are herein disallowed in 1977 and included in 1976, that reported by you in 1978 and accruable in 1977 are disallowed in 1978 and included in 1977, and that reported by you in 1979 and accruable in 1978 are disallowed in 1979 and included in 1978, as follows:

| 1976 | Per return | As corrected | Increase (decrease) to taxable income |
|---|---|---|---|
| Premiums written | $2,711,957 | $2,828,677 | $116,720 |
| Unearned premiums | 49,081 | (52,688) | (101,769) |
| Unpaid losses | 2,986,575 | 2,915,847 | 70,728 |

---

[2]Presumably respondent accepted the premium income of Universale as reported because she had no information upon which to determine additional premium income, if any.

| | | | |
|---|---|---|---|
| Foreign exchange gain (loss) | (68,424) | 293,224 | 361,648 |
| Management expense | - - - | 50,000 | (50,000) |
| | | | 397,327 |

*1977*

| | | | |
|---|---|---|---|
| Premiums written | 2,828,677 | 3,332,258 | 503,581 |
| Unearned premiums | (52,688) | (210,629) | (157,941) |
| Unpaid losses | 3,083,038 | 2,986,575 | 96,463 |
| Foreign exchange | 293,224 | 939,922 | 646,698 |
| Management expense | - - - | 48,000 | (48,000) |
| Capital loss | (1,203) | - - - | 1,203 |
| Taxable income | 4,431 | 4,433 | (2) |
| Computational error | - - - | (2) | (2) |
| | | | 1,042,000 |

*1978*

| | | | |
|---|---|---|---|
| Premiums written | 3,332,258 | 4,571,461 | 1,239,203 |
| Unearned premiums | (210,629) | (380,565) | (169,936) |
| Unpaid losses | 3,581,215 | 3,083,038 | 498,177 |
| Foreign exchange gain | 939,922 | 1,109,131 | 169,209 |
| Management expense | - - - | 55,000 | (55,000) |
| Capital gain | 1,763 | - - - | (1,763) |
| | | | 1,679,890 |

Accordingly your taxable income is increased in the respective sums of $397,327, $1,042,000, and $1,679,890 in 1976, 1977, and 1978.

According to petitioner's calculations, based on underlying documents of record, i.e., the Swiss Books, a publication of the Swiss Office of Private Insurance, table 1 on page 647 shows the ratios of claims to premiums and commissions to premiums of Swiss companies writing and ceding casualty insurance.

According to respondent's calculations, based on underlying documents of record, i.e., the Swiss Books, published by the Swiss Office of Private Insurance, table 2 on page 647 shows the ratios of losses to premiums and commissions to premiums of Swiss companies writing and ceding casualty insurance.

OPINION

This case has been a most frustrating experience for the Court, as well as for the parties. It has already generated two opinions of this Court and an opinion by the Court of Appeals for the Third Circuit which have sought to delineate a path through the thicket of problems which inhere in a situation

TABLE 1

| Reinsurer | 1975 | | 1976 | | 1977 | |
|---|---|---|---|---|---|---|
| | Claims as % of premiums | Commissions as % of premiums | Claims as % of premiums | Commissions as % of premiums | Claims as % of premiums | Commissions as % of premiums |
| Swiss Re. | 54.13 | 31.08 | 55.68 | 30.98 | 56.58 | 30.59 |
| European Re. | 41.16 | 30.75 | 38.49 | 33.50 | 43.65 | 37.03 |
| Union Re. | 44.83 | 37.44 | 51.74 | 37.58 | 55.67 | 37.92 |
| Nouvelle Re. | 57.58 | 35.24 | 70.29 | 34.86 | 55.21 | 33.82 |
| General Re. | 51.89 | 11.28 | 52.92 | 14.37 | 67.57 | 19.51 |
| Global Re. | 70.18 | 33.95 | 72.10 | 33.78 | 54.63 | 30.62 |
| Universale Re. | 72.35 | 31.48 | 71.02 | 33.80 | 73.27 | 34.25 |

TABLE 2

| Reinsurer | 1975 | | 1976 | | 1977 | |
|---|---|---|---|---|---|---|
| | % of losses to gross premiums | % of commissions to ceded premiums | % of losses to gross premiums | % of commissions to ceded premiums | % of losses to gross premiums | % of commissions to ceded premiums |
| Universale | 69.53 | 31.47 | 77.44 | 33.82 | 74.74 | 34.30 |
| Swiss Re. | 50.73 | 38.49 | 55.95 | 30.81 | 55.44 | 30.31 |
| European Re. | 49.92 | .00 | 53.82 | .00 | 51.08 | .00 |
| Nouvelle Re. | 55.46 | 10.68 | 59.94 | .00 | 53.48 | .00 |
| Union Re. | 49.61 | 36.45 | 52.04 | 36.81 | 54.52 | 36.86 |
| Gerling Global | 63.86 | 32.53 | 61.17 | 29.43 | 53.52 | 25.40 |

where the liability of a U.S. taxpayer is related to information in the hands of a foreign entity and access to that information involves the attitude of that foreign entity and the application of the laws of a foreign country. *Gerling v. Commissioner,* 86 T.C. 468 (1986), supplemented by 87 T.C. 679 (1986), revd. and remanded 839 F.2d 131 (3d Cir. 1988). Thus far, this Court and the Court of Appeals have dealt with those problems in the context of the discovery process. At this stage, this Court must now come to grips with the substantive issues of liability which also involve the application of the Federal Rules of Evidence, particularly those involving hearsay, and the rules relating to the question of evidence required of petitioner to satisfy its burden of proof that it is entitled to the claimed deductions for losses and expenses. It is in this context that our frustration arises because we are faced with a draconian approach by the parties, each insisting that the rules of evidence and the impact of these rules on petitioner's burden of proof demand a decision in its or her favor. Thus, petitioner insists that the technical figures and exercises which it received from Universale are, in and of themselves, sufficient to carry its burden of proof, i.e., there is no need to resort to any further evidence in the books and records of Universale. Respondent counters with the argument that the technical figures and exercises are not admissible evidence and, in any event, are insufficient to carry petitioner's burden of proof, i.e., that further corroboration is required in the form of evidence from the books and records of Universale. Such attitudes of the parties leave little or no room for a resolution of this case which would recognize that it is inconceivable, as respondent herself concedes, that petitioner did not incur some losses and some expenses in connection with its reinsurance business with Universale.

Our attempt to overcome our frustration and to dispose of this case is influenced by several factors:

(1) While the Court of Appeals disagreed with our conclusion as to the existence of common control of petitioner and Universale in the person of Gerling, it was careful to leave completely open for further resolution the evidentiary problems to which we have already adverted, see *infra* p. 651. Such being the case, we think that the relationship between petitioner and Universale by virtue of the role played by

Gerling in the affairs of both entities, while found not to be sufficient to establish control for discovery purposes and the sanction of dismissal, is nevertheless an element to be taken into account in determining the question of the evidence which should be required of petitioner to satisfy its burden of proof. In this connection, we are satisfied that there should be no departure from the normal rule that the burden of proof rests with petitioner and that respondent's blanket disallowance of the losses and expenses is not a sufficient reason for us to look behind the deficiency notice and cause, at the very least, the shifting of the burden of going forward with the evidence to respondent, see *Gerling v. Commissioner,* 86 T.C. at 476 n.5. Having said this, however, we note that, even taking into account the seeming commercial incest between petitioner and Universale, such draconian approach by respondent, in the context of international business relationships, leaves something to be desired.

(2) The resolution of the evidentiary and burden of proof issues herein cannot ignore the fact that the normal rules, applicable where domestic interests and legal principles are involved, may require modification in order to take into account the realities of international business relations and the impact of foreign laws. Cf. *Hongkong & Shanghai Banking Corp. v. Commissioner,* 85 T.C. 701 (1985). Thus, in the instant case, the standard of *Burnet v. Houston,* 283 U.S. 223 (1931), perhaps should not be as strictly applied.

It is against the foregoing background that we turn our attention to the particular contentions of the parties.

We deal first with petitioner's continued insistence that, under section 832, its only obligation as a matter of law is to report the bottom-line figure, i.e., net income or loss, reflected in the statements received from Universale.

Petitioner relies upon the language of section 832(b)(1)(A) and (b)(3). Subsection (b)(1)(A) defines "gross income" as:

the combined gross amount *earned* during the taxable year, from investment income and from *underwriting income as provided in this subsection,* computed on the basis of the underwriting and investment exhibit of the annual statement approved by the National Association of Insurance Commissioners, [Petitioner's emphasis supplied.]

Subsection (b)(3) defines "underwriting income" as:

the premiums earned on insurance contracts during the taxable year *less* losses incurred and expenses incurred. [Petitioner's emphasis supplied.]

Based upon these premises petitioner concludes:

Algebraically put:

gross income = underwriting income

and

underwriting income = premiums earned - (losses + expenses incurred)

Therefore

gross income = premiums earned - (losses + expenses incurred).

Thus, * * * the statute contemplates, indeed mandates, that the gross income of GIIC is its underwriting income, which by *statutory definition* is its *net* ceded share of Universale's premiums less Universale's losses and expenses.

Petitioner's position is essentially a repetition of the position it took in respect of respondent's motion for partial summary judgment, which we granted on December 14, 1989, and on petitioner's cross-motion for summary judgment, which we denied on the same date, as well as in respect of petitioner's motion for reconsideration which we denied on January 14, 1990. We continue to adhere to the views expressed in our order of December 14, 1989, which reads in pertinent part as follows:

ORDERED: That respondent's motion for partial summary judgment is granted in that petitioner is required to include in gross income 20 percent of Universale's gross income from its non-life insurance business as shown in the annual statements approved by the National Association of Insurance Commissioners. It is further

ORDERED: That petitioner's cross-motion for partial summary judgment is denied. The issue and the authorities relied upon by petitioner have been fully considered by this Court on two occasions (86 T.C. 468; 473-474 (1986) and 87 T.C. 679, 680-682 (1986)) and the Third Circuit Court of Appeals (839 F.2d 131, 143-144 (1988)) and resolved against petitioner on each of those occasions. We perceive no basis for reopening the issue for a fourth time.

Petitioner's views to the contrary notwithstanding, the Court of Appeals dealt extensively with the applicability of section 832, see *Gerling v. Commissioner,* 839 F.2d at 143-144, and rejected petitioner's position in language which clearly establishes the law of this case:

Therefore, as GIIC has not presented any persuasive justification for not adhering to the statutory instruction that GIIC use the methods prescribed by the NAIC form for calculating its gross income and deductions, *it is responsible for substantiating its deductions of the losses and expenses allocated to it by Universale.* [*Gerling v. Commissioner,* 839 F.2d at 144; emphasis added.]

As we see it, the only questions that remain open are: (1) Whether petitioner has carried its burden of proof, see Rule 142(a), in respect of the deductions for losses and expenses as reflected on the NAIC statements attached to its tax returns, and (2) the proper year for reporting the income, losses, and expenses of petitioner in respect of its reinsurance business with Universale. It is to these two questions that we now turn.

In reversing and remanding this Court on the issue of common control of petitioner and Universale, the Court of Appeals went out of its way to state:

We emphasize that ours is a narrow holding based on the current record in this case. In particular, we do not foreclose the IRS from further developing the record concerning the relationships among Gerling, GIIC, and Universale. With respect to the relationship between Gerling and GIIC, this may be done through, *inter alia,* further discovery of GIIC. If the record is further developed, the Tax Court is free to reexamine the issue of whether GIIC can be held accountable for failing to provide the books and records of Universale or information about its stockholders applying the principles we have discussed in this opinion.

We further emphasize that we express no opinion on whether the Technical Figures, the Exercise, or the publications of the Swiss Insurance Department may be used by GIIC without IRS access to the underlying documents, or on whether they are admissible in evidence, or if so, on whether they are sufficiently probative to carry GIIC's burden of proof regarding its deductions.
[*Gerling v. Commissioner,* 839 F.2d at 144.]

In arguing the evidentiary issues, the parties have locked horns on the applicability of various sections of the Federal Rules of Evidence, to wit, rules 803(6), (8), (17), and (24) and rules 1002, 1003, and 1006. We find it unnecessary to cut our way through the thicket of concepts and overlaps which characterize the decided cases in respect of the application of these sections. Rather, we will dispose of the evidentiary questions under the business records exception to the hearsay

rule contained in rule 803(6),[3] and the public records exception contained in paragraph (8)[4] and/or (17)[5] of rule 803.

The standards governing the applicability of rule 803(6) are set forth in *Saks International, Inc. v. M/V Export Champion,* 817 F.2d 1011, 1013 (2d Cir. 1987):

> The principal precondition to admission of documents as business records pursuant to Fed. R. Evid. 803(6) is that the records have sufficient indicia of trustworthiness to be considered reliable. Documents may properly be admitted under this Rule as business records even though they are the records of a business entity other than one of the parties, and even though the foundation for their receipt is laid by a witness who is not an employee of the entity that owns and prepared them. Further, there is no requirement that the person whose first-hand knowledge was the basis of the entry be identified, so long as it was the business entity's regular practice to get information from such a person. The determination of whether, in all the circumstances, the records have sufficient reliability to warrant their receipt in evidence is left to the sound discretion of the trial judge. [Citations omitted.]

Petitioner contends that the statements furnished to it each year by Universale, i.e., the technical figures and exercises (see *supra* pp. 643-644) meet these standards. Respondent advances several arguments to the contrary. First, respondent argues that the documents are financial statements which were not prepared until after the close of the year in which the transactions they reflect occurred. Therefore, respondent maintains that the "at or near the time by" requirement of rule 803(6) of

---

[3]Fed. R. Evid. 803(6) provides:

(6) Records of regularly conducted activity. A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. * * *

[4]Fed. R. Evid. 803(8) provides:

(8) Public records and reports. Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency, or (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel, or (C) in civil actions and proceedings and against the Government in criminal cases, factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.

[5]Fed. R. Evid. 803(17) provides:

(17) Market reports, commercial publications. Market quotations, tabulations, lists, directories, or other published compilations, generally used and relied upon by the public or by persons in particular occupations.

the Federal Rules of Evidence has not been met. We disagree. Although we have found no case which has dealt directly with the point, there is authority which supports the conclusion that the documents in question satisfy this requirement. See *Ford Motor Co. v. Auto Supply Co.,* 661 F.2d 1171, 1175-1176 (8th Cir. 1981) (financial statements, including profit analyses, prepared annually from underlying records); *Braunstein v. Massachusetts Bank & Trust Co.,* 443 F.2d 1281 (1st Cir. 1971) (statements of financial position and of income and expenses).[6] Second, respondent argues that none of the witnesses produced by petitioner had sufficient knowledge of how the statements were prepared or of the nature of the underlying records so that there was a lack of trustworthiness to the statements as required by rule 803(6). Again, we disagree. Kurnik and Hachmann had sufficient experience with both petitioner and Universale to satisfy us as of the substance, although not the detail of the statements. The same is true of Karli whose limited direct experience with Universale was augmented by his knowledge of Universale activities over a long period of time as a result of his participation in the reinsurance business in Switzerland.[7] Finally, we note that a degree of corroboration is present in the exercises which represented information furnished by Universale to an agency of the Swiss government as required by Swiss law as well as the publications of the official Swiss commercial insurance gazette (the Handelsamtsblatt) and industry figures published by the Swiss Office of Private Insurance.

We hold that the technical figures and exercises were admissible as business records under rule 803(6) of the Federal Rules of Evidence. *Saks International, Inc. v. M/V Export Champion, supra;* see also *United States v. Arboleda,* 929 F.2d 858, 869 (1st Cir. 1991); *United States v. Muhammad,* 928 F.2d 1461, 1469 (7th Cir. 1991); *Kissinger v. Lofgren,* 836 F.2d

---

[6]*Goldsmith v. Commissioner,* 86 T.C. 1134, 1150 (1986), involved financial statements which were not regularly prepared and covered underlying transactions which had occurred 4 to 8 years previously. It is therefore clearly distinguishable.

[7]We note that the impact of Karli's testimony was not as convincing as it might have been if he had not been substituted at the last minute by Gerling for a witness who had more direct experience with Universale. Moreover, both Karli and respondent's witness Gottheimer were less than totally persuasive, but we are satisfied that their testimony has sufficient probative force to justify admitting that testimony into evidence.

678, 683 (1st Cir. 1988); *United States v. Keplinger,* 776 F.2d 678, 693 (7th Cir. 1985). Under the circumstances of this case, our holding is in keeping with the view that rule 803(6) favors "the admission of evidence rather than its exclusion if it has any probative value at all". *United States v. Carranco,* 551 F.2d 1197, 1200 (10th Cir. 1977); see also *Matter of Ollag Constr. Equipment Corp.,* 665 F.2d 43, 46 (2d Cir. 1981). We also note that the statements in question would, in our opinion, qualify under the general exception to the hearsay rule set forth in rule 803(24) of the Federal Rules of Evidence.[8] See *Karme v. Commissioner,* 673 F.2d 1062, 1064-1065 (9th Cir. 1982), affg. 73 T.C. 1163, 1181 (1980). As far as the Handelsamstblatts and the Swiss Books are concerned, they appear to meet the public records requirements of paragraphs (8) and/or (17) of rule 803, Federal Rules of Evidence, which provide a further exception to the hearsay rule.[9] The fact that foreign agencies are involved does not preclude such a conclusion. See *In re Korean Air Lines Disaster of Sept. 1, 1983,* 932 F.2d 1475, 1481 (D.C. Cir. 1991). Respondent's objections to these documents go more to the weight to be given them than to their admissibility.

Having disposed of the documents under paragraphs (6), (8), (17), and (24) of rule 803, we need not resolve the issues as to their possible admissibility under the other previously enumerated Federal Rules of Evidence. See *supra* p. 651. As we indicated at trial, however, the technical figures, exercises, and Handelsamtsblatts are admitted only as "some evidence" of the losses and expenses of Universale attributable to the reinsurance transactions with petitioner. Thus, they are evidence that Universale suffered some such losses and some such expenses but not necessarily in the amounts reflected in the documents. This is also the case with respect to the Swiss Books. See *infra* pp. 657-658.

---

[8]Fed. R. Evid. 803(24) provides:

(24) Other exceptions. A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. * * *

[9]See *supra* notes 4 and 5.

We now turn to the burden of proof issue. Petitioner does not argue that respondent should have that burden, because of her blanket disallowance of petitioners' losses and expenses in respect of its reinsurance business with Universale.[10] Rather petitioner argues that the technical figures, exercises, and Handelsamstblatts constitute a prima facie case which, in the absence of respondent's coming forward with countervailing evidence, is sufficient to carry its burden. Our limited ruling as to the admission of the documents under paragraphs (6), (8), and (24) of rule 803 of the Federal Rules of Evidence is a rejection of petitioner's position. Moreover, it is clear that, even if the opposing party does not come forward with countervailing evidence, a prima facie case does not necessarily satisfy the other party's burden of proof. McCormick, Evidence, sec. 338 (3d ed. 1984). We are not required to accept petitioner's evidence to establish a prima facie case if it is "improbable, unreasonable or *questionable*". *Sullivan v. United States,* 618 F.2d 1001, 1008-1009 (3d Cir. 1980) (quoting *Demkowicz v. Commissioner,* 551 F.2d 929, 931 (3d Cir. 1977)). Petitioner's proof is clearly "questionable". While we are satisfied that petitioner's evidence supports the conclusion that it was responsible for the specified portion of the losses and expenses of Universale, there are too many gaps in the record for us to conclude that it was responsible in the precise amounts of such losses and expenses as shown in the technical figures, exercises, etc. None of the witnesses who testified in respect of the statements received by petitioner from Universale were in any position to testify as to the accuracy of the amounts of losses and expenses shown thereon or, more significantly, that such losses and expenses or the amounts thereof met the "ordinary and necessary" standard of deductibility as required by section 832(c). Cf. *United States v. General Dynamics Corp.,* 481 U.S. 239 (1987); *Home Group Inc. v. Commissioner,* 875 F.2d 377 (2d Cir. 1989), affg. 91 T.C. 265 (1988); *Western Cas. & Sur. Co. v. Commissioner,* 571 F.2d 514 (10th Cir. 1978), affg. 65 T.C. 897 (1976); *Sears Roebuck & Co. v. Commissioner,* 96 T.C. 61, 102 (1991), supplemented by 96 T.C. 671 (1991), on appeal (7th Cir., Aug. 1991). The same infirmity exists in respect of

---

[10]In any event, we have held that the burden of proof remains with petitioner. See *Gerling v. Commissioner,* 86 T.C. 468, 476 n.5 (1986).

petitioner's reliance on the fact that Universale was apparently audited by outside agencies, in connection with the publication of the Handelsamstblatts and the Swiss Books, including an agency of the Swiss government. There is nothing in the record which reveals the scope of, or methodology used in, such audits.

Moreover, our reluctance to accept the amounts shown on such statements is accentuated by the evidence of the activities or lack thereof on the part of Gerling with which the record in this case abounds, particularly with reference to his participation, or lack thereof, in the endeavors of respondent, the Court, and petitioner's counsel to make the underlying books and records of Universale available in order that the nature of the losses and expenses and the amounts thereof could be scrutinized. Our reluctance is reinforced by the fact that Gerling, who is a U.S. citizen and who might have thrown some light on the subject, chose not to come to the trial apparently only because of his age[11] and the fact that he had not been in the United States for 40 years and saw no point in departing from this pattern. See *Gerling v. Commissioner,* 86 T.C. at 478. We also note that, during the pendency of these proceedings, many if not all of the pertinent records of Universale were destroyed as permitted by Swiss law, and there is no indication in the record that Gerling made any effort to prevent such action even though it might not have been productive.

While it rejected our expansive view of the facts upon which we based our conclusion that Gerling represented common control of petitioner and Universale for purposes of discovery and sanctions relating thereto, the Court of Appeals made it crystal clear, see *supra* p. 651, that Gerling's role in connection with these proceedings was a proper element to take into account in determining the admissibility or probative value of evidence. We do not think it an overstatement to observe that Gerling should be characterized as the éminence grise of the business dealings between petitioner and Universale and the actions of both entities in respect of the instant case.

We are not unaware of the fact that Universale may have been seriously inhibited, if not prevented, by Swiss law from making its books and records available for use in these

---

[11]There is nothing in the record to indicate that Gerling was not in good health.

proceedings. See *Gerling v. Commissioner,* 87 T.C. at 683-684.[12] Aside from the fact that the record is silent as to what efforts were or could have been made to obtain the cooperation of the Swiss government in making Universale's books and records available for the purposes of this case, it is clear (as we indicated in *Gerling v. Commissioner,* 86 T.C. at 475-476) that such inhibitions do not enable a taxpayer to satisfy his burden of proof, if the other evidence submitted is found to be insufficient. The balancing of the requirements of the enforcement of the revenue laws of the United States and the secrecy laws of Switzerland, which is an important element in resolving disputes involving the availability of books and records located outside the United States, does not point to a contrary conclusion. E.g., *In re Societe Nationale Industrielle Aerospatiale,* 782 F.2d 120, 126-127 (8th Cir. 1986), revd. on other grounds 482 U.S. 522 (1987); *United States v. Vetco Inc.,* 691 F.2d 1281, 1330-1333 (9th Cir. 1981); Restatement 3d, the Foreign Relations Laws of the United States, sec. 442, at 351, 360-361 (1987); see *Gerling v. Commissioner,* 86 T.C. at 476. In connection with the foregoing analysis, we are not impressed by petitioner's argument that the books and records of Universale would not be useful because Universale was itself a reinsurer of some 1,400 insurers. We consider this factor as indicating no more than that respondent might have to do a sampling audit further down the line. In any event, such difficulties do not entitle petitioner to be excused from otherwise meeting its burden of proof.

In sum, the critical question posed by this case is on whom should the burden of producing the books and records of Universale rest. Petitioner in effect maintains that it has proved its case without the necessity of such production, and that if respondent wanted to use the books and records to contravene petitioner's proof it was up to her to obtain them from Universale. Respondent argues that petitioner's evidence is not sufficient to carry its burden of proof, that the responsibility for producing the books and records was on it, and that it should suffer the consequences of nonproduction. We agree

---

[12]Cf. *United States v. Vetco Inc.,* 691 F.2d 1281, 1332 (9th Cir. 1981). The record contains an expert legal opinion which deals with various provisions of Swiss law in addition to those referred to in our prior opinion, but we see no useful purpose in burdening this opinion with the details or analysis of those provisions.

with respondent. Petitioner's position, if sustained, would transform the difficulty in obtaining books and records outside the United States from a shield into a sword. This we are not prepared to do, at least under the circumstances of this case, where there are gaps in the record in terms of the deductibility of the amounts claimed and the relationship between petitioner and Universale, which smacks of "commercial incest", reflects the pervasive influence of Gerling.

As we have previously pointed out, see *supra* p. 651, the Court of Appeals clearly established that the burden of proof issue was distinct from the issue of the control necessary to support discovery sanctions. See also *Societe Internationale, Etc. v. Rogers,* 357 U.S. 197, 213 (1958), discussed in our prior opinion, *Gerling v. Commissioner,* 86 T.C. at 476, in which the Supreme Court likewise drew such a distinction. We leave to another day the question of the extent to which our analysis would apply where there were fewer gaps in a taxpayer's proof and/or there was a normal arm's-length commercial relationship between the taxpayer and the foreign entity whose books and records might reveal pertinent information.[13]

Our agreement with respondent, however, does not extend to sustaining the blanket disallowance of petitioner's deduction of the portion of Universale's losses and expenses for which it was responsible. As we have previously pointed out, see *supra* p. 648, it is inconceivable that petitioner did not incur some losses and expenses in connection with its reinsurance business in Universale, and respondent conceded as much. We are satisfied that the evidence submitted by petitioner is sufficient to support our conclusion that some losses and expenses were incurred. The problem is how to measure the amounts which should be allowed. The analyses submitted by the parties, see *supra* pp. 646-648, show that the ratios of commissions to premiums of Universale were not particularly out of line with those of other companies engaged in the same type of business. On the other hand, there is a greater

---

[13]The problems involved herein may be more easily resolved in subsequent years by virtue of sec. 845 dealing with respondent's power to allocate items in respect of reinsurance arrangements. See *Gerling v. Commissioner,* 839 F.2d 131, 142 n.14 (3d Cir. 1988). Moreover, in other situations involving books and records outside the United States, secs. 982 and 7456(b) may apply. *Hongkong & Shanghai Banking Corp. v. Commissioner,* 85 T.C. 701 (1985). Cf. 28 U.S.C. secs. 1783 and 1784 (1988).

disparity in respect of the ratio of losses to premiums.[14] We have not been persuaded by the broad, generalized explanations of petitioner's witnesses as to the possible reasons for the latter variations. Additionally, as we have previously pointed out, see *supra* pp. 655-656, the record is lacking in proof as to the extent to which Universale's losses and expenses would meet standards of deductibility under the Internal Revenue Code. Nor are petitioner's mathematical correlations on brief between the amounts shown on the technical figures and exercises, on the one hand, and the amounts shown in the Handelsamtsblatts and Swiss Books, on the other, sufficient to fill the gaps in the record and persuade us that the former amounts are fully deductible.

Doing the best we can with the record herein and applying the principle of *Cohan v. Commissioner,* 39 F.2d 540, 543-544 (2d Cir. 1930), we hold that petitioner is entitled to deduct its 20-percent share of 60 percent of Universale's expenses and 40 percent of Universale's losses. We are satisfied that these seemingly arbitrary holdings comport with the admonition of Judge Learned Hand in *Commissioner v. Maresi,* 156 F.2d 929, 931 (2d Cir. 1946), affg. 6 T.C. 582 (1946), that "The one sure way to do injustice * * * is to allow nothing whatever upon the excuse that we cannot tell how much to allow". See also *Rudd v. Commissioner,* 79 T.C. 225, 236-237 (1982).

Our task is not ended. We must now decide the year in which petitioner should account for its participation in the premium income and allowable losses and expenses of Universale. Since the inception of its reinsurance business with Universale, petitioner has consistently reported such participation for Federal income tax purposes in each taxable year on the basis of the figures supplied to it by Universale during that year. This has meant, for example, that petitioner reported in its 1978 tax return the data furnished to it during that year by Universale in its annual statements which reflect Universale's activities during 1977. Respondent has determined, under the all-events test applicable to accrual basis taxpayers, that petitioner should properly report its participation for the same

---

[14]We note that petitioner's analysis uses the term "claims" and respondent's analysis uses the term "losses". As far as we can determine in respect of these analyses, these terms are equivalent. Both analyses use the term "commissions" which represent the great bulk of Universale's expenses.

year in which Universale's activities occurred, e.g., 1977 activities in petitioner's 1977 return. Petitioner maintains that its reporting was correct. For the reasons hereinafter set forth, we agree with petitioner.

At the outset, we observe that our holding as to the includability of Universale's premium income, losses, and expenses in petitioner's Federal income tax return, see *supra* pp. 649-650, dealt only with the issue of the "what" and not the "when" of such includability. In our opinion, these are two entirely separate issues.

We are mindful of the fact that respondent has been accorded broad discretion in establishing accounting methods which taxpayers are required to follow. *United States v. Hughes Properties, Inc.,* 476 U.S. 593, 603 (1986). We are also mindful of the principle that financial accounting and acceptable tax accounting are not synonymous and that consistency of treatment by a taxpayer will not necessarily preclude respondent from rejecting the taxpayer's method of accounting for tax purposes. *Id.* Nevertheless, accounting for financial purposes and consistency of tax reporting are elements which we may take into account; this is particularly the case where, as is the case herein, respondent has not previously in prior audits challenged petitioner's methodology, *Public Service Co. v. Commissioner,* 78 T.C. 445, 456 (1982), although we recognize (see our prior opinion, *Gerling v. Commissioner,* 87 T.C. at 682) that respondent is not bound by such prior action. Moreover, industry practice is a further element to be taken into account. *Public Service Co. v. Commissioner, supra.* Finally, we should avoid indulging in accounting nuances in resolving disputes such as are involved herein. See *Fort Howard Paper Co. v. Commissioner,* 49 T.C. 275, 284 (1967). We think the application of this principle is particularly appropriate where, as is the case herein, there is no question of mismatching of income and deductions, the more frequent frame of reference of the cases according broad discretion to respondent in respect of accounting methods.

Turning now to the elements upon which petitioner's methodology rests, we note first that the time lag between the occurrence of the insured transaction and the reporting of the same by the reinsured to a reinsurer has been, and is, a characteristic of the reinsurance business; various methods of

accounting are used by the parties in dealing with the timing problem, ranging from monthly to annual reports by the reinsured to the reinsurer.[15] See Strain, Reinsurance 623-624 (1987); Carter, Reinsurance 558-559 (1983). We are satisfied based on the evidence of record and the view of these authorities that the annual accounting statements by Universale to petitioner comport with accepted accounting practice in the insurance industry, particularly in respect of European reinsurance business, see Carter, *supra*. Thus, we think it reasonable to conclude that, under the particular circumstances herein, this case falls within the ambit of the recognized principle that respondent cannot require a taxpayer to adopt the accounting method which respondent prefers when the method utilized by the taxpayer is recognized as an acceptable method. See, e.g., *Prabel v. Commissioner,* 91 T.C. 1101, 1112 (1988), affd. 882 F.2d 820 (3d Cir. 1989).

We hold that, insofar as timing is concerned, petitioner's method of reporting the elements of its reinsurance business with Universale is sustained.

*Decision will be entered under Rule 155.*[16]

---

[15]We note that, since Universale is itself a reinsurer, as much as a 3-year delay is involved, e.g., Universale learns from its reinsureds about 1976 transactions in 1977 and reports them to petitioner in 1978. Respondent is practical enough to ignore this further gap.

[16]There are some minor items which may need to be adjusted. Presumably this can be done by the parties under Rule 155.